[Crim. No. 3500.    Second Dist., Div. One.    Dec. 15, 1941.]

THE PEOPLE, Respondent, v. MICKEY COHEN, Appellant.

George Stahlman and Harry Duckett for Appellant.

Earl Warren, Attorney General, and Lewis Drucker, Deputy Attorney General, for Respondent.

DORAN, J.—Appellant was found guilty and convicted of the crime of violation of section 337a, subdivision 2, of the Penal Code, a felony, upon an information charging him with having kept and occupied a drug store and building in the city of Los Angeles with books, papers, apparatus, devices and paraphernalia for the purpose of recording and registering bets on horse races, and for the purpose of selling pools and purported pools upon the results of such races. The case was tried before the court sitting without a jury, a trial by jury having been expressly waived.

At the trial the following was presented as evidence. On February 1, 1941, an officer of the Los Angeles Police Department, vice detail, accompanied by other police officers, went into a drug store located at 758 South Rampart in Los Angeles. In the prescription room he observed a stairway leading to a room upstairs and attempted to gain entrance thereto, but found the door padlocked. The druggist in the store did not comply with a request to open this door. The officer walked into the kitchen, in back of the drug store lunch counter, observed a trap door in the ceiling, climbed up and raised the unhinged trap door and saw the appellant throwing objects through a small opening into another room. As

the officer pulled himself through the trap door, the appellant ran back into the main portion of the attic room, which was built in an L shape. The officer followed the appellant and there found a table with phone wires leading over to the table. The wires had been snipped. The officer then crawled through the opening leading into the other small attic room and recovered the objects he had seen thrown in there by appellant. These objects included a bunch of papers identified by the officer as betting markers, and another bundle containing racing publications or scratch sheets, including one which the officer stated was privately circulated and commonly used by persons keeping a book on horse racing in the locality. These objects were found by the officer in a paper carton lying on the floor of the small attic room. The scratch sheets were marked with red crayon in a manner which the officer stated had particular significance to persons keeping a book on horse races. One of the sheets in question was dated February 1, 1941, the date of appellant's arrest. The officer also found a basket containing what in his opinion were old betting markers. The officer also found three disconnected phones in the small attic room. Two of the phones thus found had attached to them a plug similar to a light plug. One of these phones the officers connected up by plugging it in to a wire in the large attic room, and through that phone so connected the officers received incoming phone calls. When the phone rang upstairs in the attic or balcony the phone in the prescription room also rang. One of the officers answered the phone several times and wrote down the conversations, as follows. The phone rang and a voice stated: "This is Verma; I want to talk to Mickey," and then it said "489, 3 to win; 582, 3 to win; 267, 1 to win, insured; 266, parleyed; 268, 2 to win; 304, 2 to win; 306, 2 to win" and "Who won the first race?" The phone rang again and a voice said: "Hello, Mickey, this is Jeff. Have the cops pinched you?" Again the phone rang, and the party on the other end of the line said: "Is this Mickey? This is Verma again. 481, 2 to win, insured, and 1 to place on the same horse." The phone rang many other times but the officer did not write down the conversations. The officer who took these calls, who, it was stipulated, was familiar with bookmaking paraphernalia, testified in relation to the messages thus received that the number preceding the

phrases "3 to win," "2 to win," etc., corresponded to the number of the horse appearing on the scratch sheet; and that the words "2 to win insured" meant that it would cost the bettor $2.20—10¢ additional on each $1.00—so that if the horse won the bookmaker would pay track odds. At the time of his arrest appellant admitted to the officers that he was the "bookie" and was compensated at the rate of $5.00 per day.

Appellant contends that the court erred in permitting the police officer to testify as to the meaning of handwriting and marks on certain alleged betting markers and scratch sheets; that the testimony of the officer in this regard merely amounted to a conclusion of the witness, and under such circumstances no *corpus delicti* was proven and the judgment cannot be supported by extra-judicial statements of defendant. Hence, appellant argues, there was insufficient evidence offered at the trial to support a finding of appellant's guilt as to the charge.

The qualifications of the officer who testified as to the writing and markings were stipulated to at the trial; but appellant contends that his testimony, to which objection was made, was not as to the custom and manner in which alleged bookmakers operated, but instead was as to the meaning of the particular notations and marks on the material before the court. The manner in which such testimony was elicited is reflected by the following quotations from the record:

"Q. Now, I will direct your attention to the printed form appearing on these several sheets of paper and ask you if this form is a form commonly used by persons keeping book on horse races in this vicinity? A. It is.

"Q. Does this form have any particular name; that is, among persons familiar with its use? A. Well, it might be classed as an ABC marker. Outside of that I do not know of any name. It really is not ——

"The Court: Whether it is a regular ABC marker or not, is it or is it not a betting marker? A. It is a betting marker, yes, sir.

"Q. By Mr. Loucks: Now, I will direct your attention to the writing appearing on the first sheet of this bunch of papers that are clipped together and ask you if you have examined that writing? A. I have.

"Q. Can you state whether or not the writing appearing on this first sheet is—bear memoranda of bets on horse races?

"Mr. Taylor: Objected to on the ground it is calling for a conclusion of the witness.

"The Court: Well, I do not think that objection is tenable in view of the stipulation. However, I think there is another objection to it. Looking at the exhibit, what does the writing on there mean, in the bookmaking business, if it has any meaning?

"Q. By Mr. Loucks: First, I will direct your attention to item 1, and ask you to read off the writing and tell his Honor what that writing means to persons engaged in keeping a book on horse races?"

"Q. Have you examined the writing appearing on the other several sheets of this same bundle of papers? A. I have.

"Q. Can you state whether or not the writing indicates they were memoranda of bets placed on horse races? A. In my opinion they are.

"The Court: And the same system of marking the markers is or is not followed throughout that pad, as far as they have been marked? A. Yes."

"Q. By Mr. Loucks: Now, I will show you another bundle of papers which is headed: 'Los Angeles Edition, Official Race Entries, Weather Conditions, Jockeys, Post Positions, Scratches, Commission Horses, Sporting News,' and I will ask you if you have seen those publications before? A. I have.

"Q. Where were these particular sheets when you first saw them? A. They were in a paper carton lying on the floor of this attic."

"Q. Now, there appears on this particular scratch sheet under the main caption, 'Hialeah Park' red crayon figures and marks, and under '1st Race' there is an elliptical figure around the number '12, Albatross'; does that particular mark have any significance to persons engaged in keeping a book? A. Well, it is ordinarily circled to indicate that the horse has won.

"Q. That is, won that race? A. Yes, has won."

"Q. And then in this same section denominated '1st Race, Hialeah Park' there is the number '26' and 'Bellcoda', and after the word 'Bellcoda' appears in red crayon the figure

'3'; does that figure have any particular significance to persons keeping a book on horse races? A. Yes, it indicates that that horse has come in third or showed."

The foregoing excerpts serve to show that the testimony of the police officer was given not as to the intended meaning of the particular marks and figures before the court, but as to the significance, meaning and use of such marks in the business of bookmaking. His qualifications having been stipulated to, the officer was properly permitted to so testify. (*People* v. *Hinkle,* 64 Cal. App. 375, 378 [221 Pac. 693] ; sec. 1863, Code of Civil Procedure.)

Appellant relies upon *People* v. *Davis,* 47 Cal. App. (2d) 331 [117 Pac. 917], recently decided by this court. But the situation in that case was the opposite to that here presented. There the officer was permitted to testify as to what was meant by the notations produced in evidence; that is, the officer there in effect testified as to the intent with which the particular notations were made. Appellant here concedes that had the officer testified that such markings were customarily put on alleged scratch sheets and markers by bookmakers in conducting bookmaking establishments, then said evidence would have been admissible. Since it is shown that the officer's testimony was to that effect, there is no merit to appellant's contention.

Moreover, as pointed out by respondent, even if appellant's contention in this regard were to be upheld, it cannot overcome the evidence that the premises in question were occupied for the purpose of registering wagers on horse races. The use to which the premises were put was sufficiently established, apart from the testimony of the police officer as to the meaning of the markings on the scratch sheets and other papers. The *corpus delicti* was sufficiently established in any event. (*People* v. *Shapiro,* 40 Cal. App. (2d) 321 [104 Pac. (2d) 688] ; *People* v. *Ryan,* 15 Cal. (2d) 492 [102 Pac. (2d) 320] ; *People* v. *Gibbons,* 39 Cal. App. (2d) 671 [103 Pac. (2d) 1005] ; *People* v. *Reifenstuhl,* 37 Cal. App. (2d) 402 [99 Pac. (2d) 564].)

The appeal is without merit and the judgment is affirmed.

. York, P. J., and White, J., concurred.