[Crim. No 11548. In Bank. Nov. 27, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. RALPH CHACON, WILLIAM MICHAEL NOAH and MARINES H. MEYERS III, Defendants and Appellants.

LeRue James Grim, Ralph R. Lopez and Ollie M. Marie-Victoire, under appointments by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Michael J. Phelan, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, C. J.—Ralph Chacon, William Noah, Marines Meyers, and Ernest Garcia were jointly charged with violating Penal Code section 4500 (malicious assault with a deadly weapon by a life prisoner). Chacon, Noah, and Meyers pleaded not guilty and not guilty by reason of insanity. Garcia pleaded not guilty. A jury returned verdicts of guilty against Chacon, Noah, and Meyers, but was unable to reach a verdict as to Garcia, and the trial court declared a mistrial as to him. After a trial on the issue of sanity, the jury found that Chacon, Noah, and Meyers were sane at the time of the offense. After a trial on the issue of penalty, the jury fixed the punishment for Chacon and Noah at death and for Meyers at life imprisonment. The trial court denied Chacon's and Noah's motions to reduce the penalty to life imprisonment and entered judgments on the verdicts. The appeals of Chacon and Noah are automatic (Pen. Code, § 1239, subd. (b)). The appeal of Meyers is pursuant to a timely notice of appeal.

On April 30, 1967, approximately 14 prisoners were housed in separate cells in the maximum security section of the Correctional Training Facility at Soledad. The maximum security section consists of single cells fronted by a passageway or tier. Guards are stationed at one end of the tier, and on the day of the incident Officers Nance and Fagen were on duty there.

At 10 a.m. five prisoners, Chacon, Noah, Meyers, Roger Smith, and Vernon Byrd, were released from their cells to exercise on the tier. Chacon, Noah, and Meyers wore skull caps with swastikas painted on them. At approximately 10:15 the attention of both guards was drawn to a disturbance on the tier. The two officers observed a scuffle between Smith, Chacon, Noah, and Meyers approximately 65 feet in front of them. Warning systems were sounded and Officer Fagen shouted to the inmates to "lock-up" (reenter their cells). Only Byrd complied with this order. Officer Knox, who was guarding the isolation cells nearby, joined Officers Nance and Fagen. The three officers saw Noah, Chacon, and Meyers crowded around Smith who was being held on the floor. Each of the three defendants had a knife. Each repeatedly stabbed Smith while the others held him. Noah and Chacon then dragged Smith approximately 40 feet and propped him in front of Garcia's cell. Chacon gave Garcia a knife, and Garcia reached out through a food slot in the cell door and stabbed Smith. Noah, Chacon, and Meyers then went to Noah's cell and locked themselves in. Officer Nance approached Noah's cell where he saw the three defendants laughing. When asked if his "buddy" had knifed him, Noah answered "That's what

happened, Sarge.'' When the officers approached Garcia's cell and asked where the knife was, Garcia replied that he had thrown it away.

The officers found three knives on the tier: two icepick type weapons and one dagger. One icepick had been fashioned from part of a hair brush; the rest of the brush was in Noah's cell. The swastika caps were also in Noah's cell. One officer testified that he saw Meyers throw a knife away before he entered Noah's cell.

Three physicians operated on Smith for five hours. He had multiple puncture wounds throughout his body and was in a critical condition for several days.

The records officer at Soledad testified that each of the four defendants was serving a life term, and that none of their indeterminate sentences had been set by the Adult Authority.

Eight inmates testified for the defense: Noah, Meyers, Garcia, four other inmates present at the time, and the victim, Smith, who was called as a prosecution witness but gave testimony favorable to the defense. Except for minor descrepancies in detail, all gave similar testimony.

The crucial defense was that none of the officers had seen the fight begin and that Smith had started it. Smith and defendants had been together at various prisons, where animosity had developed between them. Before being placed in maximum security Smith had been in isolation near defendants' cells and while there had constantly shouted threats and profanities at them. He had also had trouble with the prison guards. On the day of the offense Smith made a homosexual advance to Meyers. Noah told Smith to stop it. Smith then drew a knife and attacked Noah. Meyers came to Noah's defense, and Smith stabbed him also. In self defense, both Meyers and Noah drew their own knives and began stabbing Smith in return. Chacon then intervened in an attempt to break up the fight. He first struck Smith with his fist, stunning him and causing him to drop his knife. Chacon then picked up the knife to keep it from Smith, while continuing to attempt to break up the fight. Chacon did not stab Smith. Chacon and Noah then dragged Smith in the direction of Garcia's cell, but Garcia did not stab Smith.

Two psychiatrists testified for the prosecution at the trial on the issue of sanity. Dr. Raymond Hack, consultant at Soledad for the past 12 years, testified that he had examined Chacon, Noah, and Meyers and that on the basis of his examinations and a review of their records it was his opinion that

each was sane at the time of the assault. Dr. Robert Noce, a psychiatrist employed by the Monterey County Hospital, testified that on the basis of his examination of the three defendants, it was his opinion that each had a sociopathic personality, but was sane at the time of the offense.

Three inmates in addition to Meyers and Noah testified for the defense. Inmates Garrett and Branch testified that they had seen Noah often act so erratically that each considered him insane. Inmate Solis testified for defendant Chacon that he too often acted erratically and often went into "twilight zones" in which he became extremely noncommunicative. Noah and Meyers testified that they had never described the incident to the psychiatrists.

At the trial on the issue of penalty the prosecution submitted its case on the evidence at the trial on the issue of guilt and the trial on the issue of sanity. Chacon, Noah, and Meyers each testified in his own behalf.

At the outset we note that with respect to Chacon and Noah, there was error such as that condemned in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 521-523 [20 L.Ed.2d 776, 784-786, 88 S.Ct. 1770].

Five of the nine jurors were excused for cause on the ground of their opposition to the death penalty before they had made it "unmistakably clear" that they would "automatically" refuse to vote for the death penalty. (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522 fn. 21 [20 L.Ed.2d 776, 785].) One juror was excused when she answered, "I think I would," when asked whether she "would . . . have any objection to rendering a death verdict" if the facts and law warranted it. Three jurors were dismissed when they answered that they "would not be able to sign the [death] verdict as foreman." That answer indicated that they would not undertake what they regarded as the greater moral burden of the jury foreman, but it did not show that they would have refused to vote for the death penalty.[1] Finally, a fifth juror was excused who answered, "I don't think so" when

---

[1]One of these three jurors was excused although he was even more indecisive when asked whether he would sign his name to the verdict as foreman. When asked if he had objections to the imposition of the death penalty he stated that he did. When asked if he would nevertheless return a verdict of death if the facts called for it, he replied that he was not opposed to the death penalty as such but just to the way it was administered, and then he clarified his statement with an explanation that he was not opposed to the death penalty if the facts called for it. The juror was then asked whether he could sign his name as foreman to a death penalty verdict and he answered "I am afraid not." He was then excused.

asked if he could impose the death penalty. He was not allowed to give an unambiguous yes or no answer to the question. This error would require at the least a new trial for Chacon and Noah on the issue of penalty.

We have concluded, however, that all three judgments must be reversed as to both guilt and penalty on the ground that the refusal of the trial judge to provide separate counsel for each defendant deprived them of the right to the effective assistance of counsel.

The four defendants appeared at their arraignment without counsel. The court appointed Mr. Ralph Lopez to represent all of them. Mr. Lopez had been admitted to practice for only about six months before the trial. He represents Meyers on this appeal. Other counsel were appointed to represent Chacon and Noah on appeal. After a brief consultation with Mr. Lopez, Chacon, Noah, and Meyers pleaded not guilty and not guilty by reason of insanity; Garcia pleaded not guilty. At their next appearance, Mr. Lopez informed the court that Chacon and Noah wished to represent themselves, that Garcia, who was not present, wished separate counsel, and that only Meyers still wished Mr. Lopez to represent him.[2]

After briefly questioning Chacon and Noah, the court dismissed Mr. Lopez as their counsel but appointed him to act as their advisor during the trial. On the day set for trial, Mr. Lopez informed the court that Chacon and Noah had changed their minds, that they wanted him to represent them as well as Meyers, and that he was willing to do so because he was already familiar with the case. With the consent of Chacon and Noah, the court reappointed Mr. Lopez, and the trial proceeded. At no time did the court indicate to either Chacon, Noah, or Meyers that separate counsel might be appointed for each of them. The only choice they had was to accept Mr. Lopez or proceed without an attorney.

The right to counsel at trial guaranteed by the Sixth Amendment of the United States Constitution (*Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792,

[2]The discussion between Mr. Lopez and the court indicates that Mr. Lopez was aware that other counsel could be appointed if he felt that there was a conflict of interest between any of the defendants. ''Mr. Lopez: (Interrupting) Well, Your Honor, before proceeding I'd like to inform the court that the defendant Garcia wishes to have another attorney appointed to defend him. He's the one that is not present today. I might say that there's some conflict of interest between his case and the other three defendants that are present today, but he has informed me by letter he doesn't want me anymore, that he wants the court to appoint another attorney for him.''

774

93 A.L.R.2d 733]) and article I, section 13 of the California Constitution does not include an automatic right to separate counsel for each codefendant. One counsel may represent more than one defendant so long as the representation is effective. (*Powell* v. *Alabama* (1932) 287 U.S. 45, 71 [77 L.Ed. 158, 171-172, 53 S.Ct. 55, 84 A.L.R. 527].) ■ Effective assistance of counsel is assistance "untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." (*Glasser* v. *United States* (1942) 315 U.S. 60, 70 [86 L.Ed. 680, 699, 62 S.Ct. 457]; *People* v. *Douglas* (1964) 61 Cal.2d 430, 437 [38 Cal.Rptr. 884, 392 P.2d 964].) If counsel must represent conflicting interests or is ineffective because of the burdens of representing more than one defendant, the injured defendant has been denied his constitutional right to effective counsel. (*United States* v. *Glasser, supra*; *People* v. *Robinson* (1954) 42 Cal.2d 741, 745-748 [269 P.2d 6]; *People* v. *Lanigan* (1943) 22 Cal. 2d 569, 576-577 [140 P.2d 24, 148 A.L.R. 176]; *People* v. *Douglas, supra; People* v. *Donohoe* (1962) 200 Cal.App.2d 17, 24 [19 Cal.Rptr. 454].)

■ If defendants were denied the right to effective representation of counsel, we cannot presume that the right was waived by a failure to request separate counsel. The court did not advise them of their right to separate counsel if a conflict was present, and we cannot imply from their silence a waiver of that right. (*Carnley* v. *Cochran* (1962) 369 U.S. 506, 515 [8 L.Ed.2d 70, 76-77, 82 S.Ct. 884]; *In re Johnson* (1965) 62 Cal.2d 325, 333 [42 Cal.Rptr. 228, 398 P.2d 420]; *Lollar* v. *United States* (D.C. Cir. 1967) 376 F.2d 243, 245; *Ford* v. *United States* (D.C. Cir. 1967) 379 F.2d 123, 125.) Insofar as *People* v. *Winklespecht* (1965) 237 Cal.App.2d 227, 230 [46 Cal.Rptr. 697]; *People* v. *Byrd* (1964) 228 Cal.App.2d 646, 649-650 [39 Cal.Rptr. 644]; and *People* v. *Sprinkle* (1962) 201 Cal.App.2d 277, 282 [19 Cal.Rptr. 804], are to the contrary, they are disapproved. These cases have not been followed on this point in recent cases discussing the right to separate counsel. (See *People* v. *George* (1968) 259 Cal.App. 2d 424-432 [66 Cal.Rptr. 442] [no conflict found]; *People* v. *Watkins* (1967) 248 Cal.App.2d 603, 606 [56 Cal.Rptr. 734] [no conflict found]; and *People* v. *Keesee* (1967) 250 Cal.App.2d 794, 798 [58 Cal.Rptr. 780] [conflict found, judgment reversed, hearing denied].) In addition, they all refrained from basing affirmance solely on the procedural ground that the defendant had not objected to multiple representation in the trial court.

█ Conflicts of interest necessarily exist when the jury must fix the penalty for more than one defendant. Often the strongest argument that separate counsel can make on the issue of penalty is that his client was less culpable than the others and that he, at least, should not be executed. In addition, he must be free to stress particular mitigating elements in his client's background or other individual mitigating factors that may not apply to a codefendant. Counsel representing more than one defendant is necessarily inhibited in making such arguments and in presenting evidence to support them. He cannot simultaneously argue with any semblance of effectiveness that each defendant is most deserving of the lesser penalty. Moreover, the conflict is not limited to the trial on the issue of penalty, for normally the same jury determines both the issue of guilt and the issue of penalty. Counsel must therefore conduct the defense throughout the entire trial to stress evidence and considerations to support the lesser penalty. Counsel appointed to represent more than one defendant when the jury must fix the penalty for each is forced, as Mr. Lopez was forced in this case, to treat his clients as a group and to abandon arguments that would apply to each separately.

█ Since a common defense was presented by counsel representing all three defendants, the record is silent as to evidence that might have been developed on behalf of each defendant had he been separately represented. Nevertheless, the facts of the case are fraught with potentially effective individual defenses. On the basis of the defense testimony, defendant Noah had the strongest case for self-defense in that he was the one Smith first attacked. Defendant Meyers entered the fray to defend his ''brother'' Noah, and then was attacked himself. Defendant Chacon did not attack the victim at all. Mr. Lopez made no attempt to develop these differences. In his cross-examination of the guards, he made no effort to develop weaknesses or inconsistencies in their testimony with respect to any of the defendants separately. He made no attempt to determine whether the guards might have erred in their description of the incident so as to give rise to a reasonable doubt as to one or another of the defendants' guilt.

Separate counsel for Chacon could have argued to the jury that, regardless of who started the fight, all defense witnesses exonerated Chacon and that the guards could have been mistaken in believing that all three took turns in atttacking Smith.

Separate counsel for Noah could have argued that he struck only in self-defense and that what the guards observed thereafter was Chacon and Meyers taking advantage of the turmoil to vent their rage on Smith. Separate counsel for Meyers could have made similar contentions.

Mr. Lopez could not make these arguments in favor of each defendant to dissociate him from his codefendants' cases, for he represented them all and had to make common cause for them. This unified posture of the defense is revealed most clearly by an examination of the closing argument at the trial on the issue of guilt. The summation so merged the three defendants that at one point, the judge himself felt compelled to interrupt and point out that the jury could return a different verdict for each defendant. As the court said in *People* v. *Donohoe* (1962) 200 Cal.App.2d 17, 28 [19 Cal.Rptr. 454]: "We think that it is a fair assumption that the argument of defense counsel must of necessity have been restricted in its scope and in places restrained in its tone by an ever present concern that his comments on behalf of one defendant did not injure or offend the other."

The extent of the conflict of interest in this case is demonstrated by the fate of the fourth defendant, Garcia. His defense was as consistent with the others' defense as theirs was among themselves: all the prosecution witnesses implicated Garcia, whereas all the defense witnesses exonerated him. His defense was identical with that of Chacon, in that neither attacked Smith. Garcia, however, was represented by separate counsel who developed weaknesses in the evidence as it pertained to Garcia. He stressed the distance the guards were from Garcia's cell, the amount of lighting in the tier, the difficulty in depth perception when looking at a long line of cells. The result was that Garcia alone secured a hung jury.

The extent of the conflict of interest and its impact on Mr. Lopez's effectiveness, was certainly not so slight that we can ignore it.[3] ▮▮▮ As the Supreme Court said in *Glasser,* 315 U.S. 60, *supra,* at page 76 [86 L.Ed. 680 at p. 702], "The

---

[3]Several United States Courts of Appeals have adopted much the same position that we take here. In *Lollar* v. *United States, supra,* 376 F.2d 243, 247, the court stated: "[O]nly where ' "we can find no basis in the record for an informed speculation" that appellant's rights were prejudicially affected,' can the conviction stand. . . . In effect, we adopt the standard of 'reasonable doubt,' a standard the Supreme Court recently said must govern whenever the prosecution contends the denial of a constitutional right is merely harmless error." See also *Campbell* v. *United States* (D.C. Cir. 1965) 352 F.2d 359, 360-361 [122 App.D.C. 143]; *Sawyer* v. *Brough* (4th Cir. 1966) 358 F.2d 70, 73-74.

right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.''

We turn now to other issues that may arise on retrial.

 Defendants Noah and Chacon contend that the prosecutor committed misconduct in emphasizing their prior felony convictions at the outset of· the trial. The records officer at Soledad was the first witness for the prosecution. He testified that each of the four defendants was serving a life term at the time of the incident and listed all the convictions for which each was serving time, a total of nine violent or dangerous felonies for all of them.[4] Defense counsel did not object to this testimony or to the introduction of copies of the commitment records and the summaries of sentence data.

The evidence of these prior convictions was admissible to prove that each was serving a life term at the time of the assault on Smith. When a prior conviction is an essential element of an offense, it is admitted to prove something other than the defendant's bad character, and is admissible for that purpose.[5] (Evid. Code, § 1101, subd. (b); *People* v. *Dorado* (1965) 62 Cal.2d 338, 358 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Wells* (1949) 33 Cal.2d 330, 338 [202 P.2d 53].)

 Nevertheless, we feel that the prejudicial effect of this cumulative testimony outweighed the legitimate purposes served by its admission. The impact of this testimony cannot be overstated: at the outset of the trial, the jury was presented with the picture of four hardened, vicious convicts charged with another offense in a long line of similar violent

---

[4]Chacon had been convicted of first degree murder (Pen. Code, § 187), second degree robbery (Pen. Code, § 211), possession of a weapon by an inmate (Pen. Code, § 4502), and battery by an inmate on a non-inmate (Pen. Code, § 4501.5). Noah's convictions were for aggravated assault by a nonlife termer (Pen. Code, § 4501), attempted escape by force or violence from the county jail (Pen. Code, § 4532), and assault with a deadly weapon on a peace officer (Pen. Code, § 245). Meyers had been convicted of aggravated assault by a nonlife termer (Pen. Code, § 4501). Garcia had been convicted of possession of a deadly weapon by an inmate (Pen. Code, § 4502).

[5]The evidence concerning Chacon's conviction for battery on a non-inmate (Pen. Code, § 4501.5) could not have been admitted for this purpose since it does not carry a maximum life sentence. Since the conviction was for a recent similar offense, however, it was admissible to prove malice and to negate Chacon's defense of non-involvement except as a peacemaker. (*People* v. *Wells, supra,* 33 Cal.2d 330, 339-343; McCormick, Evidence, § 157, pp. 329-330 (1954); Witkin, Cal. Evidence (2d ed. 1966) § 345, and cases cited therein.) For this purpose, however, it could be introduced as rebuttal, for it will only be after the defense has presented its case that the defense contentions will be known.

offenses. Even the most conscientious juror would be hard pressed to concentrate solely on the facts of the crime charged in the indictment. Both defense counsel were willing to stipulate that the four defendants were serving life terms. The prosecuting attorney, however, would agree to such a stipulation only if the commitment records were admitted for his use in argument. He thus indicated both full awareness of the prejudicial effect of this testimony and a wish to make full advantage of it. The prosecution could have established the fact that the defendants are life termers in a less prejudicial way than that undertaken here.

 Both Chacon and Noah contend that the jury was prejudiced in that each defendant appeared throughout the trial handcuffed and in prison garb. It appears that all defendants were similarly treated for at least some parts of the trial. No leg chains were used, and there is no evidence of excessive use of guards in the courtroom. There was no objection to the handcuffs or the clothing. On several occasions during the *voir dire,* the trial judge, prosecuting attorney, and defense attorney mentioned the handcuffs and inquired whether the jury would be affected by them in making their decision. All responses were negative. In his argument to the jury on the issue of guilt, the prosecutor emphasized that the jury should not be prejudiced against defendants because they were in handcuffs; defense counsel admonished the jury to the same effect and did not request the court to give a similar admonition.

 A defendant may be required to undergo reasonable restraints when they are necessary to assure his detention or to maintain order in the courtroom. (*People* v. *Kimball* (1936) 5 Cal.2d 608, 611 [55 P.2d 483]; *People* v. *Burnett* (1967) 251 Cal.App.2d 651, 655 [59 Cal.Rptr. 652].) The restraints in this case were reasonable. Apparently counsel did not think them improper, for he did not object to them. In a case such as this one the use of handcuffs was not unreasonable. (*People* v. *Ross* (1967) 67 Cal.2d 64, 71-72 [60 Cal. Rptr. 254, 429 P.2d 606], revd. on other grounds 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850]; *People* v. *Burwell* (1955) 44 Cal.2d 16, 33 [279 P.2d 744]; *People* v. *Chessman* (1951) 38 Cal.2d 166, 176 [238 P.2d 1001].) Nor do we find any error in the use of prison garb. The defendants did not object to being tried in prison clothing and show no prejudice arising from it. (Cf. *People* v. *Zapata* (1963) 220 Cal.App.2d 903, 911 [34 Cal.Rptr. 171]; *People* v. *Garcia* (1954) 124 Cal.App.2d 822, 824 [269 P.2d 673].)

██ Defendants complain that the use of Smith and two correctional officers, DeBord and Weber, as prosecution witnesses was part of an invidious scheme to discredit defense witnesses.

The victim, Smith, testified for the prosecution. He stated that he had started the fight; that defendant Chacon had not been involved; that he had spoken with Officer DeBord shortly after the incident but had not implicated defendants and had not said that he would refuse to testify for the state out of fear; and that he did not presently fear the defendants.

Officer DeBord, correctional counselor at San Quentin, then testified to a conversation with Smith approximately one month after the incident. Over the objection of Garcia's counsel that the conversation was hearsay and impeachment without foundation, DeBord testified that Smith said nothing about his starting the fight, that he said all four defendants had stabbed him, that he would not testify for the state because he did not wish to be considered an informer, and that he would testify for the defendants.

Officer Weber, correctional officer at Soledad, then testified regarding the ''convicts' code,'' which he said he had seen in operation in many prisons. The ''convicts' code'' was described as an unwritten rule that prison inmates be silent about prison disciplinary matters. He testified that he had often seen prisoners refuse to make any statement implicating fellow inmates because of fear of reprisal.

This evidence was admissible. The prosecution's use of Smith as a witness was not calculated merely to open the door to impeachment of defense witnesses or the exculpatory testimony of Smith himself. Smith was the victim of the assault and was thus a necessary witness in the prosecution's case. He testified that he was attacked but went on to exculpate defendants and to affirm their defense. His testimony was evasive and uncooperative. In such a situation, impeachment of one's own witness is entirely proper. (Evid. Code, § 785; *People* v. *Johnson* (1968) 68 Cal.2d 646, 650-651 [68 Cal. Rptr. 599, 441 P.2d 111]; *People* v. *Stanley* (1967) 67 Cal.2d 812, 816, fn. 1 [63 Cal.Rptr. 825, 433 P.2d 913].) ██ One of the purposes of section 785 of the Evidence Code is to allow a party to use and impeach a hostile witness that he had called. (Comment of the Law Revision Commission to Evid. Code, § 785; Tentative Recommendation and a Study Relating to the Uniform Rules of Evidence, 6 Cal. Law Revision Com. Rep. (1964), comment to rule 20.)

█ DeBord testified that in his previous statement, Smith had described the event differently and indicated fear of the defendants. The use of a prior inconsistent statement to impeach was proper. (Evid. Code, § 780, subd. (h) ; McCormick, Evidence, § 34.) DeBord's testimony as to Smith's fear of defendants was also admissible to show bias of the witness in favor of defendants. (Evid. Code, § 780, subd. (f) ; McCormick, Evidence, § 40; *People* v. *Sweeney* (1960) 55 Cal.2d 27, 39-44 [9 Cal.Rptr. 793, 357 P.2d 1049].)

█ Weber testified to conditions generally existing in prisons and their effect on the veracity of prisoners. His testimony was relevant (*People* v. *De La Roi* (1943) 23 Cal.2d 692, 696 [146 P.2d 225, 151 P.2d 837]), and was admissible to show circumstances affecting the bias of the witness. (Evid. Code, § 780, subd. (f) ; *People* v. *Pickens* (1923) 61 Cal.App. 405, 407, 409 [214 P. 1027] ; *People* v. *Krug* (1935) 10 Cal.App.2d 172, 176 [51 P.2d 445].) The trial court did not abuse its discretion in finding that Weber was qualified as an expert. (Evid. Code, § 720; *People* v. *Clay* (1964) 227 Cal. App.2d 87, 98 [38 Cal.Rptr. 431, 100 A.L.R.2d 1421].)

The cases cited by defendants are not in point. Weber did not give his opinion of the guilt or innocence of the defendants (*People* v. *Mason* (1960) 183 Cal.App.2d 168, 173 [6 Cal.Rptr. 649]), of Smith's intent (*People* v. *Davis* (1941) 47 Cal.App.2d 331, 334 [117 P.2d 917] ; cf. *People* v. *Cohen* (1941) 48 Cal.App.2d 459, 464 [119 P.2d 995]), or of the meaning of a statute. (*People* v. *Rose* (1890) 85 Cal. 378, 382 [24 P. 817].) Nor did Weber testify to any similar acts by Smith (*People* v. *Nelson* (1928) 90 Cal.App. 27, 34 [265 P. 366] ; *People* v. *Stewart* (1890) 85 Cal. 174, 175 [24 P. 722].) Weber testified, not that Smith was lying, but that the conditions under which he lived might compel him to lie.

█ Although the point was not raised in the briefs, our examination of the record has convinced us that the instructions on malice aforethought were inadequate.[6] █ Penal

---

[6] The trial judge gave the following instructions: "An essential element of the offense stated in Section 4500 of the Penal Code is that the assault be committed with malice aforethought. As used in Section 4500, that term denotes 'purpose and design in contradistinction to accident and mischance . . . it is used to denote the purpose and design of the assaulting party.' In order to establish guilt under 4500 Penal Code, it is not required that the assault be made with intent to kill." This does not adequately describe the state of mind constituting malice aforethought, and we disapprove its use. The trial courts should follow the definitions developed under sections 187 and 188 in instructing on malice aforethought.

Code section 4500 expressly requires that an assault punishable therein must be "with malice aforethought." The words malice aforethought in section 4500 have the same meaning as in sections 187 and 188. (*People* v. *McNabb* (1935) 3 Cal.2d 441, 456 [45 P.2d 334]; *People* v. *Wells* (1949) 33 Cal.2d 330, 338 [202 P.2d 53]; see *People* v. *Berry* (1955) 44 Cal.2d 426, 430 [282 P.2d 861].) Thus the rules that have evolved regarding malice aforethought as an element in a charge of murder apply to section 4500.

 In the instant case, defendants requested an instruction on the issue of provocation. This request was denied, although the judge did instruct on the issue of self-defense. The refusal to give the requested instruction was erroneous. In a prosecution for murder the presence of sufficient provocation or heat of passion negates the existence of the requisite malice aforethought. (*People* v. *Valentine* (1946) 28 Cal.2d 121, 132 [169 P.2d 1].) In the usual case, this instruction supplements the self-defense instruction. Thus, in a prosecution for murder, even though the defense of self-defense fails, as it might for excessive retaliation by the defendant, the jury might still find the original attack sufficient to constitute provocation, which would preclude a finding of malice aforethought and reduce the crime to manslaughter. Since the refusal to instruct on provocation would be erroneous in a prosecution for murder, it was erroneous here.

A closely analogous situation involves the defense of diminished capacity. This defense, now established in murder prosecutions (*People* v. *McDowell* (1968) *ante*, p. 737 [73 Cal.Rptr. 1, 447 P.2d 97]), was originally applied in a prosecution tion under section 4500. (*People* v. *Wells* (1949) 33 Cal.2d 330, 343-346 [202 P.2d 53].) The analogy is particularly apt in that a finding of diminished capacity, like a finding of provocation, can also negate the existence of malice aforethought. (*People* v. *Conley* (1966) 64 Cal.2d 310, 318 [49 Cal.Rptr. 815, 411 P.2d 911].)

The judgments are reversed.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Respondent's petition for a rehearing was denied December 24, 1968, and the opinion was modified to read as printed above.