[Crim. No. 5521. Third Dist. Oct. 5, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
KAYAKA DeSHANNON et al., Defendants and Appellants.

984

## Counsel

William M. Lyons and Marsha B. Shanle, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Daniel J. Kremer and Gary Allon Larson, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

PIERCE, P. J.—Defendants were convicted by a jury of first degree robbery (Pen. Code, §§ 211, 211a), with defendant Suggs admitting two charged prior convictions.

Each of the three defendants presents essentially the same contention on appeal, to wit: that representation of all three by the same assistant public defender constituted a deprivation of the right to effective counsel. As will be shown herein, that contention is meritorious. However, although representation of all three defendants by the same attorney was error, it was not prejudicial even though we apply the very strict rule of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. We will affirm the judgments against all defendants.

Defendant DeShannon was positively identified by a number of witnesses as the woman who took approximately $900 in $20 bills from an open cash register drawer in a Sacramento market about 6 p. m., April 29, 1969, while the attention of the responsible market clerk was distracted by an unidentified Negro male. (The clerk, Paul Lee, was making change for a dollar bill tendered by this man for an orange priced at eight cents. As Lee attempted to give the customer this change the latter mumbled he had pennies in his pocket, kept asking "How much?" "How much?") Lee turned in time to see Miss DeShannon reaching into the cash register, removing $20 bills, and a struggle ensued. The woman bit Lee on the hand. The commotion was increased by her screams and the attention of customers and clerks was attracted. Shortly before the woman took the money, another Negro male had asked clerk Robert Brace, who was taking stock, to check out a few purchases. After the sale had been rung up, this Negro told Brace he had some change in his pocket. At that point Brace noticed the struggle between Lee and Miss DeShannon and joined it. The woman was able to pull away, and as she did so produced a pistol which, to the state witnesses who witnessed the scene and observed the gun, appeared to be real. She waved the pistol at the gathered clerks and store customers and ran from the store towards the gas station at the far end of the parking lot where she got into the rear seat of a black sedan. A customer in the market testified that a Negro male ran from the store after Miss DeShannon and entered the rear seat of the black sedan which then left the scene. Market clerk, Robert Parker, testified that that man was wearing a red hat.

Clerk John Harmon ran to the parking lot, got into his own car, and joined by clerk Parker followed the black sedan described to him as the suspects' car. Harmon and Parker testified that the chase which ensued was at high speeds, reaching from 95 to 100 miles per hour. Defendant Suggs testified that Vann was driving and also corroborated Vann's testimony that his speed did not exceed 65 miles per hour. During the chase Harmon stopped a taxi briefly to request notification of the police but did not lose sight of the subject car. Harmon and Parker observed the sedan stop and Miss DeShannon get out. She flagged down a passing motorist, Donald Strelow. She told him their car had run out of gas. She and her two companions entered Strelow's yellow Ford. Strelow's identification of the three was positive. Suggs was wearing a red hat. This Suggs admitted in his testimony.

The three hitchhikers exited the Strelow vehicle in the Strawberry Manor area of Sacramento where, within a very few minutes, they were apprehended by police assisted by Harmon and Parker. Arrest occurred shortly after 7:05 p.m.

At the time of arrest, defendant Suggs had $326 in his possession (which he claimed to have earned but did not identify any employer), including eleven $20 bills and one $50 bill. Defendant Vann had $188 (which he claimed to have earned—also with no employer mentioned—and won), including nine $20 bills. Two cash register receipts from the victimized premises, issued on April 29, 1969, and Miss DeShannon's identification card were found in the glove compartment of the black sedan which belonged to the ex-wife of defendant Suggs. Miss DeShannon's fingerprints were found on the right front door glass (inside surface), the right rear door glass (inside and outside), the right wing window (inside) and the left front door glass (inside). Fingerprints of the male defendants were also present.

All three defendants, including Suggs who had been charged with and had admitted two prior felony convictions (grand theft in 1961, receiving stolen property in 1967), testified for the defense. No other evidence was submitted. Their testimony was: Defendants Vann and Suggs were passing through Sacramento on a trip from San Francisco to Reno and had just dropped two hitchhiking airmen at McClellan Air Force Base. They claimed that they were completely innocent of any involvement in Miss DeShannon's criminal activities. Although they had once met her briefly at a party six months earlier in Las Vegas, they did not recognize her when she ran towards their car in the market parking lot and asked them if they would drive her away because she was having difficulties with her husband. Later, when she removed her wig, they recognized her. Shortly after leaving the parking lot, they saw her throwing what she said was some trash from the car. She soon told them that people were chasing her because she had taken their money. They told her to get out of the car, but she threatened to inculpate them if they did not help her get away. Vann testified that he took the key out of the ignition to make her think the car had broken down, but when Strelow stopped his car to give her a ride, both defendants thought it would be safer to stay with Miss DeShannon and get her to the police in case she tried to involve them.

Miss DeShannon, allegedly a Reno resident who had just arrived in Sacramento that day on her way home, corroborated the testimony of her codefendants and admitted sole guilt for the crime. She testified that she impulsively (because it was there) took the money from the open cash drawer, and when attempting to put it in her purse during the struggle with the clerks, saw and pulled out the toy cap pistol which she had planned to return to a friend's child. She ran from the store to a car occupied by two black men and asked them for help because of difficulties with her husband. Once away from the scene she threw the money and toy gun

from the car. Miss DeShannon also testified that she thought she had lost her identification card in Las Vegas six months earlier.

## REPRESENTATION OF MULTIPLE DEFENDANTS BY SINGLE COUNSEL

■ The Sixth Amendment of the United States Constitution and article I, section 13, of the California Constitution both guarantee that every defendant in a criminal case shall have representation by counsel. That does not necessarily demand in multiple defendant cases that each (indigent) defendant must be assigned separate counsel. One counsel may represent all if and when such representation is *effective*. (*People* v. *Chacon* (1968) 69 Cal.2d 765, 773-774 [73 Cal.Rptr. 10, 447 P.2d 106].)
■ In *Chacon* "effective" assistance is explained in terms quoted from *Glasser* v. *United States* (1962) 315 U.S. 60, 70 [86 L.Ed. 680, 699, 62 S.Ct. 457], as assistance "untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." ■ The meaning of "conflicting interests" is not restricted to *inconsistent defenses*. (*People* v. *Donohoe* (1962) 200 Cal.App.2d 17 [19 Cal.Rptr. 454].) In *People* v. *Douglas* (1964) 61 Cal.2d 430, 436-437 [38 Cal.Rptr. 884, 392 P.2d 964], the fact that one defendant was *more heavily involved than another* was deemed to call for separate representation. (See also *People* v. *Gallardo* (1969) 269 Cal.App.2d 86, 89 [74 Cal.Rptr. 572], holding a conflict of interest necessarily exists when the jury must fix the penalty for more than one defendant.) This court said in *People* v. *Watkins* (1967) 248 Cal.App.2d 603, at page 606 [56 Cal.Rptr. 734] (hg. den.): "The *Odom* decision [*People* v. *Odom* (1965) 236 Cal.App.2d 876, 878] assembles a useful catalog of the principal situations in which the courts have discerned conflicts of interest: 'Conflicts of interest among codefendants may arise when it would profit one defendant to attack the credibility of another [citation]; when counsel would be restricted in final summation because he might injure one defendant by arguments in favor of another [citation]; *when one defendant has a record of prior felony convictions and the others do not* [citation]; when the defenses of codefendants are factually inconsistent [citation]; or when appointed counsel believes a conflict of interest may exist [citation].' " (Italics ours.)

Two further observations are in point before we embark upon a discussion and determination of these three appeals.

■ *People* v. *Chacon, supra,* 69 Cal.2d 765, 774, further holds that a defendant's failure to object to joint representation does not imply a waiver if the trial court does not advise him of his right to separate counsel. (See also *In re Hochberg* (1970) 2 Cal.3d 870, 878 [87 Cal.Rptr. 681,

471 P.2d 1].) ■ An "appellate court may use hindsight to ascertain whether or not there was an actual conflict of interest and, if so whether appellant was injured [Citation]." (*People* v. *Mitchell* (1969) 1 Cal.App. 3d 35, 38 [81 Cal.Rptr. 478] (hg. den.).)

### It Was Error to Appoint a Single Attorney to Represent All Three Defendants

■ Each defendant should have been represented by a separate attorney. True, all were members of an alleged team which planned and executed a holdup of the market. Each, however, occupied a different and unique position. Miss DeShannon contended she had an uncontrollable impulse to take money from open cash drawers. Vann had an apparent predilection to pick up and give a ride to a strange woman (and a man with a red hat) running out of a market. Suggs had a criminal record, while Vann and Miss DeShannon did not. We will discuss the latter factor. It raised problems for the attorney assigned to represent him not shared by the others. E.g., Suggs had admitted his two prior convictions. That admission gave him the advantage of prohibiting the prosecution from reading those convictions to the jury (Pen. Code, § 1025)—unless Suggs took the witness stand. If he did that, then the prosecution on cross-examination could still bring out the fact of the prior convictions for impeachment purposes. Representing Suggs the assigned trial attorney had to make a tactical decision. What choice should he advise Suggs to make? Should he testify and gain the added corroboration of Vann's story of their mishappenstance of a chance meeting with defendant DeShannon but lose the advantage of keeping knowledge of his past record from the jury? And for another reason was it wise for Suggs to remain mute at the trial? Every lawyer, indeed anyone with common sense, knows that even absent the comment proscribed by *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], individual jurors do wonder why a presumably innocent defendant does not testify. What should the attorney tell Suggs in that regard, particularly when he also had the responsibility of advising defendants DeShannon and Vann?

And representing them (and thus wearing another cap) the attorney had another reason to keep Suggs' record away from the jury. *They* faced the problem of guilt by association. If Suggs kept off the witness stand, the jury would have no way of knowing that DeShannon and Vann had consorted with a previously convicted felon.

Most of these are ad hominem problems. They are nevertheless very real ones. (See *People* v. *Douglas, supra,* 61 Cal.2d 430, 436.) We could go on. The combination of conflicts between the three defendants were

many. Further discussion is unnecessary. The conflicts were actual, not just potential.

## THE ERROR WAS HARMLESS

The record does not disclose that the codefendants were informed of their right to separate counsel. ■ In the event of actual conflict the question of ineffective respresentation may be raised for the first time on appeal. The question there to be decided is whether appellants were injured. The error is of United States constitutional proportion. (*People* v. *Mitchell, supra,* 1 Cal.App.3d, pp. 38-40.) This court cannot say the error was unprejudicial unless the prosecution, notwithstanding the error, has by its evidence convinced us the error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824]; *People* v. *Gallardo, supra,* 269 Cal.App.2d 86, 89.) ■ We are convinced that the prosecution fulfilled that burden in the instant case. Guilt of all three defendants was so conclusively proven it is certain the verdicts must have been the same had three of the state's most able and experienced attorneys skilled in the criminal law separately represented each of the defendants.

The prosecution's proof consisted of three phases: the robbery, the attempted escape, the arrest. At each of these stages all three codefendants were shown positively to be active participants in their assigned roles. Proof of their participation and consequential total proof could not have been more absolute had the whole affair been portrayed on television.

Defendant DeShannon was positively identified as the person who took the money from the open cash drawer, who wrestled with the clerks, who pulled a gun[1] and held up clerks and customers and who ran from the store followed by Suggs, the man with the red hat—positively so identified. Both jumped into a black sedan in which Vann, the getaway chauffeur, was waiting. All were still together when the car stopped and, with Miss De-Shannon as their spokesman, got out and hitchhiked a ride with Strelow. All (while riding in the car driven by Vann) had been followed by store clerks Harmon and Parker. Strelow identified the three. Harmon and Parker saw them switch cars and continue to follow them while they were riding in the Strelow car. Also, with the assistance of a radio-equipped taxi and its driver, they were able to call the police. The trio's point of exit from the Strelow car was fixed in evidence beyond doubt. The three were still together minutes later when they were pointed out by Harmon and Parker to the police and arrested. On that proof no jury could possibly acquit.

---

[1]Whether the gun was real or imitation, loaded or unloaded, made no difference. The people held up thought it was real. (*People* v. *Aranda* (1965) 63 Cal.2d 518, 532 [47 Cal.Rptr. 353, 407 P.2d 265].)

Nor did the story by Suggs and Vann corroborated by Miss DeShannon change the possibilities one bit. That tale was of two good Samaritans to two hitchhiking service men, of a woman of unremembered past (but brief) acquaintance rushing out of a store to jump into the Suggs-Vann vehicle while the two men were awaiting their reward from the hitchhikers of a bottle of liquor and replenishment of their gas supply (but it was a story which overlooked the fact that Suggs, the man with the red hat, had been observed following defendant DeShannon out of the store and into the rear seat of the getaway car). The story continues on to relate a request of Miss DeShannon to transport her to Yuba City so that she could escape family problems. (But the car moved in another direction and Suggs and Vann say they were en route to Reno.) The woman then revealed her felonious act and threatened to implicate her companions if they did not cooperate. The fact she had thrown away the gun in the meantime had not in any way relieved them of the fear that they *would* actually be implicated, although they awaited the right moment (which never seemed to arrive despite several opportunities) to turn her over to the police. (Meanwhile, defendant DeShannon says she threw away the money she had stolen. Yet coincidently Suggs carried $326 on his person, Vann $188, most of the bills being of the same denominations as those taken from the store cash register.)

We refrain from characterizing this story. It speaks for itself.

The judgments are affirmed.

Friedman, J., and Janes, J., concurred.

A petition for a rehearing was denied October 30, 1970, and appellants' petitions for a hearing by the Supreme Court were denied December 3, 1970. Peters, J., Tobriner, J., and Sullivan, J., were of the opinion that the petitions should be granted.