[No. D042551. Fourth Dist., Div. One. Jan. 20, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JEROME GENE JETER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

---

[1] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

## Counsel

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Gary W. Schons, Assistant Attorneys General, Robert M. Foster and Pamela A. Ratner Sobeck, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**O'ROURKE, Acting P. J.**—A jury convicted Jerome Gene Jeter of assault by a prisoner serving a life sentence (Pen. Code, § 4500)[2] and possession of a stabbing weapon while in custody (§ 4502, subd. (a)). The court found Jeter had two prior strike convictions. (§§ 667, subds. (b)–(i), 1170.12.) The court sentenced Jeter to 25 years to life for the assault and stayed the sentence for possession under section 654. Jeter contends (1) the court committed reversible error by instructing with CALJIC Nos. 1.22 and 3.30, and by failing to modify CALJIC No. 9.00; (2) the prosecutor committed misconduct during closing argument; and (3) the abstract of judgment must be amended to conform to the court's sentence. We agree the court committed reversible error by giving conflicting jury instructions as to assault by a life prisoner (§ 4500) and reverse the conviction for that offense. In all other respects, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

Jeter's first trial ended in a mistrial on March 14, 2003, because the jury could not reach a verdict. This trial began on May 6, 2003.

Abdulmalik Saafir, a chaplain at Calipatria State Prison, testified that on May 29, 2001, about 11:00 a.m., he was in the C yard waiting for the chapel to be opened. An inmate named Hassan approached him to tell him he would not go to the service. During the conversation, a bald African-American man with a Fu Manchu beard wearing prison blues and sunglasses, walked behind Hassan, "socked" him, and continued walking.[3] Saafir immediately said, "No playing out here." Hassan then grabbed his back and said, "That guy just stuck me." Saafir kept his eye on the man, who quickly walked towards a gate near the program office and tossed an object through the gate. The man looked like Jeter although Saafir could not make a positive identification at trial.

---

[2] All further statutory references are to the Penal Code unless otherwise specified.

[3] Inmates are not allowed to run in the yard.

After the stabbing, Hassan walked quickly after the man who had stabbed him. Three inmates stood up to block Hassan's path. One of the three, an inmate named Brooks, squared off with Hassan to fight him.

Saafir called out to Correctional Officer Jose Ruiz to tell him a stabbing had occurred. Ruiz called the yard down, which requires all the prisoners to sit or lie on the ground. Ruiz then moved Brooks into the program office. Immediately thereafter, Correctional Sergeant Jay Seidel came onto the yard. Saafir told Seidel that Ruiz had taken the wrong inmate and pointed out the attacker.

Seidel testified Saafir pointed out the attacker, who Seidel identified as Jeter. Seidel handcuffed and searched Jeter and then had someone take Jeter to the program office for questioning. After Jeter waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], Seidel asked him if he had assaulted Hassan. Jeter calmly answered, "Yes." Seidel then asked, "Why did you assault Inmate Hassan with a weapon?" Jeter responded, "It was a personal disrespect issue." Seidel explained that because respect is very important to inmates, inmates take insults very seriously and deal personally with people who insult them.

Officer Ruiz testified that when he noticed Hassan and Brooks in a fighting stance, he walked towards them and told Brooks to leave. Saafir then told him that Hassan had been stabbed. Ruiz immediately called the yard down. Ruiz assumed Brooks had stabbed Hassan and took Brooks into the program office. When Ruiz came back onto the yard, Seidel told him to search for a weapon. He found a weapon in the dirt two feet beyond the gate. It was a piece of flat metal, about five and three-quarters inches long, one-sixth inch wide, and one-eighth inch thick, which was sharpened to a point at one end and had clear metal plastic on the other end. Ruiz found no blood on the weapon, and explained that stabbing weapons often have no blood on them because puncture wounds like the one sustained by Hassan do not leave much blood on the weapon and because inmates are very good at cleaning their weapons.

Registered nurse Scott Blackman testified that he examined Hassan, who had sustained a wound in his lower right flank, near his kidney. The wound was about one to one and one-half inches long, one-half inch wide and two to four inches deep. After Blackman applied a pressure bandage to the wound and took Hassan's vital signs, he called an ambulance because wounds near kidneys can be "very dangerous." Blackman also examined Jeter and did not find any blood on his hands or clothing.

Hassan testified for the defense that he had had no problems, disagreements, arguments or fights with Jeter prior to the incident. Hassan

denied seeing anyone behind him when he was stabbed. After he realized he had been stabbed, Hassan walked towards six or eight inmates standing near the program office to determine if one of them had stabbed him. Although Hassan did not determine who had stabbed him, he knew for certain Jeter had not stabbed him. Hassan admitted that if he testified Jeter had stabbed him, he would be labeled a snitch. Hassan also admitted that about 49 days after the incident, he wrote a note saying his life would be in danger if he testified. Hassan testified he had written the note only because he wanted to transfer to another yard with better access to a law library. Hassan testified he did not want to testify in this trial.

## DISCUSSION

### I. *Jury Instructions*

Jeter contends the court committed reversible error by instructing with CALJIC Nos. 1.22 and 3.30, and by failing to make certain modifications to CALJIC No. 9.00 because these instructions conflict with the specific intent requirement for assault by a life prisoner (§ 4500).

Section 4500 provides in part: "Every person while undergoing a life sentence, who is sentenced to state prison within this state, and who, with *malice aforethought*, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable with death or life imprisonment without possibility of parole." (Italics added.)

██ The court instructed with a modified version of CALJIC No. 8.11, which defines malice aforethought, and with CALJIC No. 1.22, which defines malice as "a wish to vex, [defraud,] annoy or injure another person, or an intent to do a wrongful act." However, malice and malice aforethought are not synonymous. (*People v. Sekona* (1994) 27 Cal.App.4th 443, 453 [32 Cal.Rptr.2d 606].) Malice aforethought as used in section 4500 has the same meaning as it has for murder convictions, requiring either an intent to kill or "knowledge of the danger to, and with conscious disregard for, human life." (CALJIC No. 8.11; see *People v. St. Martin* (1970) 1 Cal.3d 524, 536–537 [83 Cal.Rptr. 166, 463 P.2d 390]; *People v. Chacon* (1968) 69 Cal.2d 765, 780–781 [73 Cal.Rptr. 10, 447 P.2d 106].) For that reason, courts should not instruct with CALJIC No. 1.22 when a defendant is charged with violating section 4500. (*St. Martin, supra,* at pp. 536–537.) Accordingly, the court erred.

The court correctly instructed with CALJIC No. 7.35, which defines the elements of the crime of assault by a life prisoner as follows:

"1. A person was assaulted;

"2. The assault was committed [with a deadly weapon or instrument] [or] [by means of force likely to produce great bodily injury];

"3. The assault was committed by a person while undergoing a sentence of life imprisonment, having been sentenced to life imprisonment within this state; and

"4. The assault was committed with malice aforethought."

The use note to CALJIC No. 7.35 requires the court to instruct with CALJIC No. 9.00, which defines assault. However, unlike section 4500, assault requires only general intent and does not require intent to harm. (*People v. Colantuono* (1994) 7 Cal.4th 206, 214–215 [26 Cal.Rptr.2d 908, 865 P.2d 704].) Specifically, CALJIC No. 9.00 states, "However, an assault does not require an intent to cause injury to another person, or an actual awareness of the risk that injury might occur to another person." This sentence directly contradicts the requirement of malice aforethought and must be removed when CALJIC No. 9.00 is given to accompany CALJIC No. 7.35. Further, CALJIC No. 9.00's use note requires the court to instruct with CALJIC No. 3.30[4] on the concurrence of act and general criminal intent even though section 4500 requires the specific intent of malice aforethought.[5]

Here, the jury was given conflicting instructions. CALJIC Nos. 9.00 and 3.30 required the jury to find general intent. CALJIC Nos. 7.35 and 3.31.5[6] required the jury to find the specific intent of malice aforethought. Additionally, the jury was instructed as to both malice aforethought and simple malice.

Conflicting instructions or instructions that misdescribe an element of an offense are harmless "only if 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' [Citation.] 'To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 774 [60 Cal.Rptr.2d 1, 928 P.2d 485]; see also *People v. Maurer* (1995) 32 Cal.App.4th 1121, 1128–1129 [38 Cal.Rptr.2d 335].) On this record of conflicting instructions, it is impossible to know the jurors unanimously

---

[4] CALJIC No. 3.30 was properly given as to count 2, possession of a weapon by a prisoner.

[5] The use note to CALJIC No. 9.00 should be changed to make it clear that CALJIC No. 3.30 should not be given for section 4500 offenses.

[6] CALJIC No. 3.31.5 requires the union of the act and a certain mental state, although the instruction given in this case did not specify malice aforethought as that mental state.

found Jeter committed the offense with malice aforethought. We therefore reverse the section 4500 conviction because we cannot find beyond a reasonable doubt that these conflicting instructions did not contribute to the verdict obtained. In view of the reversal, we need not address Jeter's unopposed contention that the abstract of judgment must be amended to conform to the court's sentence.

II.   *Prosecutorial Misconduct**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

We reverse the conviction for assault with a deadly weapon by a life prisoner (§ 4500). We affirm the judgment in all other respects.

Aaron, J., and Irion, J., concurred.

A petition for a rehearing was denied February 16, 2005, and respondent's petition for review by the Supreme Court was denied April 27, 2005.

---

*See footnote, *ante*, page 1212.