**UNITED STATES of America, Appellee,**

v.

**Crystal Marie UNGER, Appellant.**

**No. 82–1816.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 9, 1982.

Decided Feb. 18, 1983.

Rehearing Denied April 15, 1983.

Gary J. Shea, Shea, Spande & Shea, Cedar Rapids, Iowa, for Crystal Marie Unger, appellant.

Robert L. Teig, Asst. U.S. Atty., N.D. of Iowa, Cedar Rapids, Iowa, for appellee.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.

LAY, Chief Judge.

On July 20, 1977, Crystal Marie Unger and her husband Robert Ellis Unger both pleaded guilty in federal district court to the crime of kidnapping under 18 U.S.C. § 1201(a) (1976). They both were given a fifty-year sentence. Crystal Marie Unger brings this appeal from the district court's denial of her motion to vacate her sentence pursuant to 28 U.S.C. § 2255 (1976).

On December 11, 1976, the Ungers were in Waterloo, Iowa, visiting Vicky Howard, a woman who at one time had been married to Crystal Unger's first husband. Vicky had planned to go out for the evening and it was agreed that the Ungers would baby-sit her two-month-old son, Ricky Joe, at their motel. Both Vicky and Crystal Unger testified that Vicky had taken care of Crystal's children in the past, and Vicky further testified that Crystal had baby-sat for her previously without any problem. The government contends that Vicky and Crystal agreed that the baby was to be returned the following day. Crystal denies that there was any such understanding. She claims that she told Vicky she could not baby-sit because she was leaving the state and Vicky replied: "I don't care. Take him with you." The baby was not returned the next day and Vicky reported the baby as missing.

The Ungers left Waterloo on December 11, and traveled to Dubuque, Iowa, where they had the baby examined at a hospital because he was wheezing. They then traveled through Illinois and south and west to California in a stolen rental car, using false names and continually defrauding churches and welfare agencies. In California they traded the stolen car for a used car and drove to Salt Lake City, Utah, where they stole another rental car. While in Salt Lake City, on January 2, 1977, the Ungers sought medical treatment for the Howard baby at a hospital. Robert Unger testified that an injury occurred to the baby when he was tossing the infant in the air and dropped him on an iron bed rail.[1] The

---

1. There were early contradictory stories concerning how the injury occurred. Crystal testi-

fied that Robert told her to lie to the emergency

infant's scrotum had been torn open and his testicles were injured. Surgery was performed and the baby was discharged three days later.

On January 10, 1977, the Ungers returned to Waterloo. They placed Ricky Joe and his belongings in a taxicab and gave the driver the fare and the address of the baby's mother, with instructions to return Ricky Joe directly to her. The Ungers then continued their travels for another month until they were arrested in Mason City, Iowa, on February 7, 1977.

The State of Iowa charged Robert and Crystal Unger with child stealing and held a preliminary hearing to determine probable cause. A Waterloo attorney, Don Gottschalk, was appointed to represent both defendants. Federal kidnapping and transporting stolen motor vehicle charges were then filed and the state prosecutor dismissed the state charges to allow prosecution under federal law. Gottschalk continued to represent both Robert and Crystal Unger in all the federal proceedings.

At her formal arraignment Crystal Unger pleaded not guilty to each count. The trial of both Robert and Crystal was set to begin on July 20, 1977. On the day of trial, after the jury was sworn, Gottschalk presented the Ungers with the government's offer of a plea bargain and advised them to accept it. Crystal Unger testified that she and Robert agreed to the plea bargain, then changed their minds, and Gottschalk told them it was too late to change. Crystal and Robert agreed to plead guilty to the kidnapping charge and Robert additionally agreed to plead guilty

to one count of transporting a stolen vehicle in interstate commerce. Their pleas were accepted at the change of plea hearing held the same day. At that hearing the district court told them that imprisonment for any term of years or life was the maximum punishment possible for the kidnapping charge.

On August 25, 1977, the court held a sentencing hearing, at which Gottschalk spoke on behalf of each defendant separately and urged leniency. Crystal's age, lack of prior criminal activity, and background were mentioned. The court sentenced Crystal to a fifty-year term of imprisonment for the kidnapping charge and sentenced Robert to a fifty-year term for kidnapping with a concurrent five-year term for the stolen vehicle charge. The remaining counts were dismissed and no appeal from the sentence was taken.

Thereafter, Robert filed a series of section 2255 motions to reduce, modify, or vacate sentence, or to request other relief, usually on behalf of both himself and Crystal. His last motion to vacate sentence was treated by the district court as a motion for relief for himself only and we affirmed the district court's denial of the motion. *United States v. Unger,* 635 F.2d 688, 689 (8th Cir.1980).

Crystal filed a section 2255 motion to vacate sentence on her own behalf on January 11, 1978, and the motion was dismissed without hearing.[2] Crystal filed the present section 2255 motion on June 2, 1980, and raised some grounds different from those raised in her earlier motion.[3] The district

---

room physician about how the injury happened.

2. Crystal raised four grounds: (1) that she was not guilty because not all elements of the charge of kidnapping were present and the plea was without factual basis; (2) that she was denied effective assistance of counsel; (3) that her guilty plea was coerced; and (4) that the government violated its *Petite* policy.

3. The stated grounds in the second section 2255 motion were: (1) that testimony given in the preliminary hearing for the state child stealing charge showed she was not guilty; (2) that the indictment was defective; and (3) that she was

subjected to double jeopardy because she was prosecuted in both state and federal court. These grounds were considered and rejected by the district court. The third ground was rejected because it was previously raised in Crystal's 1978 motion. Although the government claimed the other two grounds had been raised and rejected in previous motions filed by Robert, the court found that Robert could not represent Crystal's interests and none of his motions would be considered.

The issues considered on this appeal were not enumerated as the asserted grounds in the motion, but were raised in Crystal's "Memorandum of Points and Authorities in Support of

court denied her motion without a hearing on September 12, 1980, and Crystal appealed to this court. We reversed the district court's decision and remanded for an evidentiary hearing concerning the voluntariness of her guilty plea and whether she had knowingly waived her right to separate representation. *United States v. Unger,* 665 F.2d 251 (8th Cir.1981) (*Unger I*).

Magistrate Hodges held the evidentiary hearing on February 5, 1982, and, as we will discuss, made certain recommended findings. The district court modified the magistrate's findings and denied Crystal's motion, holding that there was no actual conflict of interest and that Crystal had waived her right to have separate counsel. Crystal has now once again appealed to this court. Upon review we find that the district court erroneously interpreted our decision in *Unger I*; we reverse and remand for new sentencing proceedings.

### 1. *Voluntariness of the Plea.*

■ Crystal claims that attorney Gottschalk told her if she pleaded guilty she would be given probation and if she insisted on standing trial she would probably get the death penalty. In *Unger I* we found Crystal's allegations were not conclusory or wholly incredible and we remanded to allow her the opportunity to substantiate her claims. *See Blackledge v. Allison,* 431 U.S. 63, 74–76, 97 S.Ct. 1621, 1628, 52 L.Ed.2d 136 (1977); *Machibroda v. United States,* 368 U.S. 487, 495–96, 82 S.Ct. 510, 514, 7 L.Ed.2d 473 (1962).[4]

At the evidentiary hearing, the only evidence Crystal offered to substantiate the alleged promise of probation was her testimony and her affidavit filed with this court in *Unger I.* Her testimony is inconsistent with her own previous statements. In her section 2255 motion filed on January 11, 1978, she stated all the terms and conditions of the plea bargain as: "All counts would be dropped except Kidnapping." There was no mention of probation. In a letter to Judge Edward J. McManus, filed September 11, 1978, Crystal stated that she pleaded guilty only because her attorney said she would be given five years. There is nothing in the letter about probation. Finally, in her section 2255 motion filed in 1980, Crystal does not mention that she was promised any particular sentence in consideration for a guilty plea.[5]

Further, attorney Gottschalk testified that no promise of a particular sentence was made. His testimony is consistent with his statement about the terms of the plea bargain made at the change of plea hearing. The magistrate found Gottschalk's testimony to be credible and found Crystal Unger's testimony could not be believed. We are satisfied that the magistrate's findings on credibility are supported by the record and agree with his conclusion that Crystal's claim of a promised sentence is without support.

The evidence is also conflicting regarding the alleged threat of the imposition of the death penalty. Crystal asserts that Gottschalk was unaware that the death penalty could no longer be imposed for a conviction pursuant to the kidnapping stat-

Motion to Vacate Sentence" filed the same day. In her memorandum Crystal cited cases discussing an attorney's conflict of interest resulting from joint representation of codefendants. She argued that a conflict was created when Robert Unger wanted to plead guilty and she wanted to stand trial. Crystal's memorandum also asserted that her plea was unintelligent and involuntary. These issues were addressed neither by the government's answer to Crystal's motion nor by the district court in its order denying her motion.

4. We discussed the rule of *United States v. Goodman,* 590 F.2d 705, 711–12 (8th Cir.), *cert.*

*denied,* 440 U.S. 985, 99 S.Ct. 1801, 60 L.Ed.2d 248 (1979), that if a defendant can make a strong showing that a guilty plea was entered in reliance on false assurances of the sentence to be imposed, the plea can be set aside as involuntary.

5. The motions filed by Robert Unger further weaken Crystal's claim because his version of the plea bargain has also changed over time. This court discussed the Ungers' change of plea hearing at length and rejected Robert Unger's claim that his guilty plea was entered involuntarily. *United States v. Unger,* 635 F.2d at 691–92.

ute.[6] Crystal further states that she wrote Gottschalk a letter in May 1980 to ask him whether the possibility of the death penalty was the only reason they decided she should plead guilty. He responded on May 23, 1980, in a letter stating: "the death penalty possibility was, obviously, a consideration in any decision to enter a guilty plea." Although this letter lends credence to Crystal's claim, there is much evidence to the contrary.

Gottschalk filed an affidavit in which he swore that he had not reviewed his files when he responded to Crystal's letter and that the reference to the death penalty was a misstatement. He further swore that he had at no time discussed the death penalty with Crystal. Upon reviewing his files Gottschalk stated that he had a copy of the kidnapping statute containing language that life imprisonment was the maximum penalty. Also, at the sentencing hearing Gottschalk stated that life imprisonment was the maximum punishment for kidnapping. Although Gottschalk's testimony at the evidentiary hearing regarding his letter was not totally consistent with his affidavit, the magistrate found his testimony and explanation credible and found Crystal's testimony on this issue not credible. The magistrate also relied on the district court's examination of Crystal at the change of plea hearing, at which the court asked if the plea were the result of any threats or promises and the defendants answered negatively. See Blackledge v. Allison, 431 U.S. at 73–74, 97 S.Ct. at 1628; United States v. Goodman, 590 F.2d at 710–11. The magis-

trate and the district court found that the evidence did not support Crystal's claim of involuntariness. We hold this finding was not clearly erroneous and that Crystal's plea was entered into voluntarily.[7]

2. *Conflict of Interest.*

In *Unger I* we addressed the issue of whether Crystal was denied effective assistance of counsel because of a conflict of interest arising from the joint representation of Crystal and her codefendant by one attorney. Relying on *Austin v. Erickson,* 477 F.2d 620 (8th Cir.1973), we found that Crystal's counsel was unable to use his best efforts to exonerate Crystal for fear of implicating Robert. We found that this divided loyalty created an actual conflict of interest and "remand[ed] for a determination of whether Crystal Unger knowingly and intelligently waived her right to separate counsel." 665 F.2d at 254. Following the evidentiary hearing, the magistrate issued his recommendation stating that, first, he was bound by this court's finding that an actual conflict existed; second, that the conflict did not adversely affect counsel's representation of Crystal; and third, that although Crystal generally waived her right to separate counsel that waiver was insufficient to waive an unperceived conflict that was never called to Crystal's attention.

The district court modified the magistrate's findings, stating that it was not precluded by the court of appeals' finding that an actual conflict existed because the issue had not first been presented to or decided

---

**6.** Crystal and Robert were indicted pursuant to 18 U.S.C. § 1201(a) (1976), which provides a maximum punishment of life imprisonment. Until the Supreme Court's decision in *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), section 1201(a) permitted the imposition of the death sentence only upon a jury's recommendation and thereby made the risk of death the price of a jury trial. The Court invalidated the death penalty provision because it imposed a chilling effect on the exercise of a constitutional right. 390 U.S. at 572, 581, 88 S.Ct. at 1211, 1216. *See also Brady v. United States,* 397 U.S. 742, 745–46, 90 S.Ct. 1463, 1467, 25 L.Ed.2d 747 (1970).

**7.** In her brief filed for this appeal Crystal also contends that her plea was involuntary because of her poor physical and mental health at the time of the plea, her low level of education, her age, her inexperience with the legal system, and her capacity to be dominated by Robert. *See generally Rinehart v. Brewer,* 561 F.2d 126, 130–31 (8th Cir.1977). These claims were not previously raised in this section 2255 motion and were not the subject of this court's remand order in *Unger I.* The magistrate and the district court made no factual findings regarding them and a full record has not been developed. We do not consider them here.

by the lower court.[8] The district court further stated that it did not believe the court of appeals would make a binding determination of a factual issue in that posture and held that the evidentiary remand was for the purpose of determining whether a conflict existed. The district court proceeded to find: first, that no conflict of interest existed; second, that Crystal had not proved her attorney's performance was adversely affected; and third, that Crystal had knowingly and intelligently waived her right to separate counsel. This result, the district court reasoned, was controlled by *United States v. Cox,* 580 F.2d 317, 320–21 (8th Cir.1978), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 851, 59 L.Ed.2d 43 (1979).

We must respectfully disagree with the district court's interpretation of this court's opinion in *Unger I. Unger I* found that the record before the court " 'luminat[ed] the cross-purposes under which [Crystal's counsel] was laboring.' " 665 F.2d at 255 (quoting *Glasser v. United States,* 315 U.S. 60, 73, 62 S.Ct. 457, 466, 86 L.Ed. 680 (1942)).[9] Unequivocally, *Unger I* found that under the undisputed record a conflict of interest existed. Our remand was for the sole purpose for the court to determine whether Crystal had waived her right to separate counsel. *Id.* at 254.

■ The government contends on this appeal that *Unger I* did not mean what it apparently said and did not make a finding of actual conflict. The government further claims that the court of appeals is not a fact-finder and that the government had no opportunity to present evidence to controvert Crystal's conflict claim. We submit that if the government wished to dispute the ruling in *Unger I* it should have filed a petition for rehearing with this court and it did not do so. The government cannot prevail in this proceeding by contending *Unger I* was incorrect because that ruling governs subsequent proceedings and is now the law of the case. *See Houghton v. McDonnell Douglas Corp.,* 627 F.2d 858, 864–65 (8th Cir.1980).[10]

■ The magistrate's report stated *Unger I* clearly found a conflict of interest, but was less clear about whether there was an adverse effect on the lawyer's representation. The Supreme Court set out the standard by which a conflict of interest reflects a constitutional violation in *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980): "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." (footnote omitted). *See also Parker v. Parratt,* 662 F.2d 479, 484 (8th Cir.1981). On this basis the magistrate found the conflict of interest did not adversely affect counsel's ability to protect Crystal Unger's interests. We must again disagree. The *Unger I* court noted that the only aggravating factor in the kidnapping charge was the injury to the infant's scro-

---

**8.** We find Crystal did raise the conflict issue in her supporting pro se memorandum. *See supra* note 3. Such a pro se filing should be broadly read. *See Hill v. Wyrick,* 570 F.2d 748, 751 (8th Cir.), *cert. denied,* 436 U.S. 921, 98 S.Ct. 2272, 56 L.Ed.2d 764 (1978). We note the district court also observed, in an order denying one of Robert's motions, that joint representation may have been a problem, but that the defendants waived separate counsel. *See United States v. Unger,* 635 F.2d at 690.

**9.** The record in this case may distinguish it from *Wood v. Georgia,* 450 U.S. 261, 272–73, 101 S.Ct. 1097, 1104, 67 L.Ed.2d 220 (1981), in which the Supreme Court remanded for a determination of whether a conflict existed because the record was not clear.

**10.** The law of the case doctrine generally requires that a decision on a former appeal be followed in any subsequent proceedings unless evidence subsequently introduced is substantially different or the decision is "clearly erroneous and works manifest injustice." *Continental Bank & Trust Co. v. American Bonding Co.,* 630 F.2d 606, 608 (8th Cir.1980); *see also White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir.1967). Although the law of the case doctrine is not rigidly binding, we are convinced that the ruling in *Unger I* was not clearly erroneous and we are bound to follow it. *See United States v. Roberts,* 650 F.2d 933, 934 (8th Cir.) (per curiam), *cert. denied,* 454 U.S. 973, 102 S.Ct. 523, 70 L.Ed.2d 392 (1981); *Melong v. Micronesian Claims Commission,* 643 F.2d 10, 17 (D.C.Cir.1980).

tum and that Crystal was not present when the injury occurred. The court further reasoned that Crystal's counsel, if he had not also represented Robert, would have argued her lack of involvement with the injury made her less culpable than Robert and that she should receive a lighter sentence. The record makes clear that counsel's failure to distance Crystal from the aggravating injury at the time of sentencing had an adverse effect on Crystal's representation.[11]

With this resolution, we then confront the question whether the conflict of interest found in *Unger I* existed when Crystal entered her guilty plea, or existed only when Crystal was sentenced. Other than a passing reference to the plea negotiations and the possibility of Crystal testifying against Robert, 665 F.2d at 255, we did not discuss in *Unger I* what a more vigorous advocate could have done for Crystal at the entry of her plea. We did not discuss Crystal's conclusory allegations that she wanted to stand trial and Robert wanted to plead guilty. We discussed only the conflict of interest apparent at the time of sentencing and the adverse effect that conflict had on counsel's ability to advocate that Crystal should receive a lighter sentence.

From our own review of the record, including the transcript of the evidentiary hearing and the opinions of the magistrate and district court, we conclude that there was no conflict of interest that adversely affected Crystal's representation when she pleaded guilty. Her allegation that she wanted "to fight" while Robert was anxious to plead is without support anywhere in the record. The change of plea hearing transcript shows that Crystal was allowed to speak on her own behalf and that counsel said very little during the hearing. We

hold that Crystal's guilty plea should stand because it was not entered involuntarily and was not vitiated by a violation of her right to conflict-free representation.

### 3. *Waiver of Separate Counsel.*

We can now consider the question whether Crystal Unger knowingly and intentionally waived her right to separate counsel. There is no question that such a right may be waived. *See Holloway v. Arkansas,* 435 U.S. at 483 n. 5, 98 S.Ct. at 1178 n. 5; *Glasser v. United States,* 315 U.S. at 70, 62 S.Ct. at 464; *United States v. Agosto,* 675 F.2d 965, 969–70 (8th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 77, 74 L.Ed.2d 74 (1982); *United States v. Cox,* 580 F.2d at 320. The district court found that Crystal knowingly and voluntarily waived her right.

Waiver of the right to separate counsel was first addressed by the Supreme Court in *Glasser v. United States.* The Court found Glasser, an experienced assistant United States attorney, had not waived his right to the assistance of counsel by his silent acquiescence in the appointment of joint counsel. The Court stated Glasser never affirmatively waived his initial objection to joint representation and that the trial court had not shown sufficient concern for Glasser's basic rights. Citing *Johnson v. Zerbst,* 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), the Court said the trial court had the responsibility to determine the accused had made an intelligent and competent waiver. 315 U.S. at 70–71, 62 S.Ct. at 464–65.

At the time Crystal Unger was sentenced, although no case had squarely addressed the issue, the law in this circuit apparently required that a waiver be made

---

11. *See Holloway v. Arkansas,* 435 U.S. 475, 490, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978) ("But in a case of joint representation of conflicting interests the evil ... is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also ... in the sentencing process.") (emphasis original); *Developments in the Law—Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1244, 1381 (1981) ("By making comparisons between defendants, or by *failing* to make such compari-

sons, the lawyer will sacrifice the interests of one client to those of another.") (emphasis original) (footnote omitted); *see also People v. Chacon,* 69 Cal.2d 765, 775, 73 Cal.Rptr. 10, 16, 447 P.2d 106, 112 (1968) (Traynor, C.J.) ("[Counsel] must be free to stress particular mitigating elements in his client's background or other individual mitigating factors that may not apply to a codefendant. Counsel representing more than one defendant is necessarily inhibited in making such arguments ....").

with an understanding of the potential conflict. In *Buffalo Chief v. South Dakota,* 425 F.2d 271, 280 (8th Cir.1970), this court observed that because there was "no warning that any conflict of interest might occur during the trial," the uneducated defendant could not be expected to possess the sophistication necessary to waive an unperceived conflict. The court recognized that the situation would be different if the possible conflict of interest was pointed out to the defendant. This observation is consistent with *United States v. Swanson,* 509 F.2d 1205, 1210 n. 7 (8th Cir.1975), in which the court noted that the defendants were well-educated and both were informed of the potential conflict by the trial court. The *Swanson* defendants had the requisite education and information to effect a knowing waiver. Finally, in *Austin v. Erickson,* 477 F.2d 620, 626 (8th Cir.1973), the court found that an actual conflict of interest existed and held that the state had the burden of showing the defendant knowingly and intelligently waived her right to separate counsel.[12]

In light of the guidelines established by this caselaw for a knowing waiver, it is evident that Crystal Unger did not knowingly waive her right to separate counsel. Crystal was not specifically warned of the dangers of joint representation because neither her counsel nor the court admitted being aware of any conflict of interest.[13] Crystal made four appearances before the magistrate or the district court. These were the only opportunities for a discussion on the record of the potential conflicts of interest or difficulties arising from joint representation. As a review of these appearances shows, there was never any mention of a conflict of interest or possible danger from joint representation.[14]

Crystal was formally arraigned before Magistrate Hodges on July 5, 1977. At that time the magistrate told Crystal only that she had a right to separate counsel without explaining the significance of having her own counsel or the potential dangers of joint representation. There was nothing said by counsel for the government or by defense counsel to indicate that potential conflicts of interest had been discussed with either defendant or that counsel had considered the issue and could foresee no conflicts. Without some minimal showing that Crystal was aware that a problem might arise from joint representation we cannot presume she waived her right to separate counsel.

Crystal changed her plea from not guilty of all counts to guilty of the kidnapping charge on July 20, 1977, before Judge McManus. The only mention of representation was by the clerk in preliminary questioning of both defendants: "Have you been satisfied with the representation of your counsel thus far?" Answer: "Yes." With no indication that there might be some difficulty with the representation in the future, this monosyllabic answer to a

---

**12.** *See also United States v. Valenzuela,* 521 F.2d 414, 416 (8th Cir.1975), *cert. denied,* 424 U.S. 916, 96 S.Ct. 1117, 47 L.Ed.2d 321 (1976); *United States v. Williams,* 429 F.2d 158, 161 (8th Cir.), *cert. denied,* 400 U.S. 947, 91 S.Ct. 255, 27 L.Ed.2d 253 (1970). Both cases found no actual conflict of interest and did not reach the question of waiver, but suggested in dicta that the trial court should conduct a careful inquiry to assure itself that no conflict of interest was likely to arise.

**13.** Other courts have addressed this issue. *See United States v. Carrigan,* 543 F.2d 1053, 1057 (2d Cir.1976) (where no discussion of possible conflict initiated by the court, it cannot be assumed defendant intelligently made choice of counsel); *United States v. Gaines,* 529 F.2d 1038, 1045 (7th Cir.1976) (defendant could not make knowing waiver "in the absence of a specific warning of the serious danger to his defense"); *see also United States v. Garcia,* 517 F.2d 272, 278 (5th Cir.1975) (requiring trial courts to "address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest"), *quoted in United States v. Lawriw,* 568 F.2d 98, 104 (8th Cir.1977), *cert. denied,* 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 60 (1978).

**14.** The tape recording of Crystal's initial appearance on February 25, 1977, has been lost, and therefore, we have no record from which to make a determination of waiver.

nonjudicial officer is hardly sufficient to waive an important constitutional right.[15]

Crystal was sentenced by Judge McManus on August 25, 1977. Again, the only mention of representation at the sentencing hearing was by the clerk in preliminary questioning: "Have both of you been satisfied with the representation that counsel has given you in this matter?" Answer: "Yes." Again, we find that single syllable answer to the clerk's question to be inadequate to show an informed and intelligent waiver of the right to conflict-free representation. As other courts have found, we think some narrative response by a defendant would be the better, although not required, practice for determining the defendant's understanding. *See, e.g., United States v. Curcio,* 680 F.2d 881, 889 (2d Cir. 1982) ("[Q]uestions designed to elicit ... a narrative statement of [the defendant's] understanding are preferable to questions designed to elicit mere 'yes' or 'no' answers."). Thus, in none of Crystal's four court appearances do we find any evidence of a waiver, and nothing offered at the evidentiary hearing would lead us to conclude otherwise.

■ We note in passing that the trial court has a "weighty responsibility" in making a determination of whether there has been an effective waiver. Therefore, we think it essential for the trial court, rather than the clerk of the court who is not a judicial officer, personally to question a defendant on *all* matters of representation.

The dignity and authority of the court should cause a defendant to reflect on the importance of his or her answer, while the same question posed by the clerk may seem to be unimportant.[16]

To further emphasize the duty of the trial court, we again mention *United States v. Lawriw,* 568 F.2d 98 (8th Cir.1977), *cert. denied,* 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 60 (1978). In *Lawriw* we announced an affirmative duty of inquiry by the trial court when defendants were represented jointly:

> The defendant must voluntarily and with full knowledge of the consequences decide on dual representation. The court should address each defendant personally and advise him of the potential danger of dual representation. The defendant should have an opportunity and be at liberty to question the trial court on the nature and consequences of dual representation and the entire procedure should be placed on the record for review.

*Id.* at 104 (quoting *State v. Olsen,* 258 N.W.2d 898, 907 (Minn.1977) (footnote omitted)). The trial court also is required by rule 44(c) of the Federal Rules of Criminal Procedure, which became effective in 1980, to conduct such an inquiry.[17]

The lawyer also has an obligation to consider carefully the problems of joint representation and to advise the clients of any possible difficulties. *See* Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Re-*

15. Any determination of waiver to be made from the change of plea hearing is further obscured by the existence of two different transcripts of the hearing. The first transcript, dated August 2, 1977, has single "yes" or "no" answers to the questions posed without indication of which defendant, that is Crystal or Robert, is speaking. The second transcript, dated February 13, 1981, deliberately indicates both defendants answering every question individually. Both transcripts contain the same court reporter's certificate that "the foregoing pages are a true and complete transcript of my shorthand notes." Neither counsel at oral argument could offer any explanation for the existence of two different transcripts. We mention this discrepancy only to highlight the difficulty of ascertaining an effective waiver from an unclear

and equivocal record. *See generally* 1 ABA Standards for Criminal Justice, Standard 6–1.6 (2d ed.1980) (judge's duty concerning record of judicial proceedings).

16. We note that the court did later question the defendants. Nonetheless, the clerk should have no role in interrogation beyond the mere identification of the witness.

17. Although the new rule and this court's reasoning in *Lawriw* invite affirmative inquiry by the trial judge, we acknowledge that, in the absence of objection, the sixth amendment does not require the trial court to initiate a discussion about the propriety of joint representation. *See Cuyler v. Sullivan,* 446 U.S. at 346 & n. 10, 100 S.Ct. at 1717 & n. 10.

**454**

*sponsibilities of the Defense Attorney,* 62 Minn.L.Rev. 119, 154–55 (1978). The Model Code of Professional Responsibility DR 5–105(C) prohibits representation of multiple clients unless it is "obvious that [the lawyer] can adequately represent the interest of each [client] and if each consents to the representation after full disclosure of the possible effect of such representation." The Model Rules of Professional Conduct Rule 1.7 (Final Draft 1982) is consistent and proposes that in matters of joint representation the lawyer explain the "implications of the common representation and the advantages and risks involved." *See also* 1 ABA Standards for Criminal Justice, Standard 4–3.5(b) (2d ed.1980):

> The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several codefendants except in unusual situations when, after careful investigation, it is clear that:
>
> (i) no conflict is likely to develop;
>
> (ii) the several defendants give an informed consent to such multiple representation; and
>
> (iii) the consent of the defendants is made a matter of judicial record. In determining the presence of consent by the defendants, the trial judge should make appropriate inquiries respecting actual or potential conflicts of interest of counsel and whether the defendants fully comprehend the difficulties that an attorney sometimes encounters in defending multiple clients.

In summary, we agree with the magistrate's finding that Crystal did not waive an unperceived conflict that was not brought to her attention. *See* Comment, *Conflict of Interests in Multiple Representation of Criminal Co-Defendants,* 68 J.Crim.L. & Criminology 226, 246 (1977). Her uninformed acquiescence to joint representation did not meet the standard required for a knowing and intelligent waiver. We vacate that portion of the judgment relating to Crystal's sentence. We request that counsel other than Don

Gottschalk be appointed to represent her and that a new sentencing proceeding be held. The case is remanded to Judge McManus for a new hearing and a new sentence. We are confident that the district court can conduct a new hearing and objectively review Crystal's sentence, setting aside its prior considerations. However, in the event that Judge McManus would prefer that another judge conduct the hearing and impose the sentence, this court will defer to the exercise of his discretion in this regard and be willing to designate another district judge if called upon to do so. We wish to make it clear, however, that we leave this decision in the hands of Judge McManus.

The cause is remanded for further sentencing proceedings in accord with this opinion.