911 F.2d 155
 CRUM & FORSTER MANAGERS CORPORATION OF NEW YORK, d/b/a
International Insurance Company, Appellee,
v.
BASIN ELECTRIC POWER COOPERATIVE, a North Dakota Electric
Cooperative Corporation, Appellant.
 No. 89-5277.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 16, 1990.
Decided Aug. 16, 1990.
Rehearing and Rehearing En Banc
Denied Sept. 25, 1990.
 
 Boyd H. Ratchye, St. Paul, Minn., for appellant.
 Jay Fiedler, Grand Forks, N.D., for appellee.
 Before ARNOLD, Circuit Judge, HEANEY, Senior Circuit Judge, and FRIEDMAN,* Senior Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 At issue on this appeal is whether Basin Electric Power Cooperative (Basin) can recover in excess of 6.9 million dollars under a nonprofit organization liability insurance policy issued by Crum & Forster Managers Corporation of New York (Crum & Forster). The district court held that the policy did not provide coverage to Basin. We affirm.
 
 
 2
 The facts underlying Basin's claim against Crum & Forster were stated in an earlier opinion of this Court and need not be fully restated here. See Basin Elec. Power Co-op v. Midwest Processing Co., 769 F.2d 483 (8th Cir.1985). Suffice it to say that Basin entered into a commercial contract with the Midwest Processing Company (Midwest) under which Basin invested in excess of five million dollars in facilities necessary for the processing of sunflower seed bulbs. Basin was to recoup this money from Midwest over a period of years. As sole security for this investment, Midwest procured a three-year, five million dollar letter of credit from the Continental Illinois National Bank and Trust Company of Chicago (Continental) in favor of Basin. The letter of credit, which was set to expire on March 31, 1984, contained a provision permitting Basin to draw on it upon the filing of a petition by or against Midwest under the Bankruptcy Code.
 
 
 3
 A few months before the expiration date, Basin became concerned with Midwest's financial condition.[1] The board of directors and officers decided, on the advice of counsel, to file a petition placing Midwest into involuntary bankruptcy. They took this action to recover on the letter of credit.
 
 
 4
 No creditors joined Basin in filing the petition. Midwest objected to Basin's action. It contended that because it had more than twelve creditors, at least three creditors had to join in the petition. The bankruptcy court rejected Midwest's argument and gave Basin thirty days to secure additional creditors. Basin secured the two additional creditors within the allotted time period. The bankruptcy court, finding that the three-creditor requirement had been satisfied, refused to dismiss the involuntary bankruptcy proceeding and entered an order for relief.
 
 
 5
 Midwest appealed to the United States District Court for the District of North Dakota. That court reversed the bankruptcy court and dismissed the proceeding. It held that Basin had acted in bad faith in submitting the petition without including at least two other creditors when it knew that Midwest had more than twelve creditors. Basin Elec. Power Co-op v. Midwest Processing Co., 47 B.R. 903, 908 (D.N.D.1984).
 
 
 6
 The statutory three creditor requirement reflects the purpose of an involuntary bankruptcy proceeding as envisioned by Congress: to protect the interests and desires of the creditors as a whole. That reasoning has application to the facts of this case. Those creditors holding the largest claims against Midwest do not desire a bankruptcy proceeding, but were attempting instead to reach an out-of-court restructuring agreement before Basin filed the involuntary petition. Indeed, Basin's unsecured debt represents a small fraction of Midwest's total debt. Filing an involuntary petition may have been in the best interests of Basin, but was not seen by Midwest's other creditors as being in their best interests.
 
 
 7
 Basin's claim against Midwest is the subject of a significant dispute between the parties both as to liability and as to amount. Accordingly, the Bankruptcy Court did not consider Basin's claim in determining whether Midwest was generally not paying its debts as they became due. (R.A. 33 at 21). That Midwest's debt to Basin cannot be considered as evidence of nonpayment of debts is further reason for strict adherence to the three creditor requirement.
 
 Id. at 908. It further stated:
 
 8
 Having concluded that the Bankruptcy Court erred in not dismissing the involuntary petition for failure to meet the three creditor requirement and by reason of Basin's bad faith in filing the petition, it is not necessary that this Court address the final issue raised by Midwest: that the Bankruptcy Court erred in its finding that Midwest is generally not paying its debts as such debts become due.
 
 
 9
 Id. at 911. This court affirmed.
 
 
 10
 The three creditor requirement is designed to prevent use of involuntary bankruptcy proceedings by creditors as a means of harassing an honest debtor. If the three creditor requirement is to have any legal significance, it may not be knowingly circumvented with an eye to adding other creditors later on. The sole purpose of Basin Electric was to file a petition quickly before the letter of credit expired. The parties had a contract dispute regarding the letter of credit. Basin Electric was motivated by the desire to attain an advantageous position with regard to the letter of credit. The use of the petition by Basin Electric to effect a nonbankruptcy purpose is further evidence of bad faith.
 
 
 11
 Basin Electric Power Co-op v. Midwest Processing Co., 769 F.2d at 487 (citation omitted).
 
 
 12
 Meanwhile, Continental had paid Basin five million dollars pursuant to the letter of credit. When this court accepted Midwest's view that Basin had filed in bad faith, Continental commenced an action to recover that amount. Basin promptly settled with Continental, agreeing to refund the amount paid plus interest and costs.
 
 
 13
 Basin then demanded that its insurer, Crum & Forster, reimburse it in the sum of 6.4 million dollars for the loss caused it by the "wrongful act" of its officers and directors in filing the bankruptcy petition found to be done in bad faith by the district court and affirmed by this court. The insurer denied coverage and promptly commenced an action for a declaratory judgment seeking "a policy construction of 'no coverage' for the claim involved." Crum & Forster v. Basin, No. A1-87-175, slip op. at 1 (D.N.D. Apr. 18, 1989) [April 18 order]. Crum & Forster filed a motion for summary judgment. It was denied originally. Crum & Forster v. Basin, No. A1-87-175, slip op. at 8 (D.N.D. August 22, 1988) [August 22 order].[2] Crum & Forster subsequently renewed its motion. The district court granted summary judgment in favor of Crum & Forster on the grounds that the policy did not provide coverage. April 18 Order at 5.[3] It stated:
 
 
 14
 After reviewing the policy, and the facts and circumstances giving rise to Basin's claim under it, it is inconceivable to the court that the policy provides coverage for the $5 million and accrued interest. Therefore, as a preliminary threshold, it will be the order of the court that the policy provides no coverage applicable to the return of property acquired by "wrongful act" by either the entity or the other insureds. If Basin cannot show an entitlement to the $5 million under a commercial contract, it certainly cannot obtain the same result under the insurance contract. Such a result is clearly unconscionable.
 
 
 15
 Id.
 
 
 16
 Basin contends on appeal that the district court erred in sua sponte entering summary judgment in favor of Crum & Forster on an issue that had not been briefed, argued, or raised by Crum & Forster in its motion for summary judgment and that the policy does provide coverage. Crum & Forster had instead asserted that Basin was not entitled to recover under the policy by virtue of certain policy exclusions.[4]
 
 
 17
 We look to the language of the policy to determine whether coverage extends to these facts as held to exist in various court decisions.
 
 NON-PROFIT ORGANIZATION LIABILITY INSURANCE
 
 18
 THIS IS A CLAIMS MADE POLICY. READ YOUR POLICY CAREFULLY.
 
 
 19
 IN CONSIDERATION of the payment of the premium and subject to all of the terms, conditions and exclusions of this Policy, the Company agrees with the Insureds under Coverage A and the Entity under Coverage B as follows:
 
 INSURING AGREEMENTS
 I. Coverages A and B
 
 20
 A. The Company will pay on behalf of the Insureds all Loss which the Insureds shall be legally obligated to pay for any civil claim or claims first made against them because of a Wrongful Act, provided that the claim is first made during the policy period and written notice of said claim is received by the Company during the policy period.
 
 
 21
 B. The Company will reimburse the Entity for all Loss for which the Entity shall be required by law to indemnify individual Insureds for any civil claim or claims first made against them because of a Wrongful Act, provided that the claim is first made during the policy period and written notice of said claim is received by the Company during the policy period.
 
 
 22
 . . . . .
 
 III. Definitions
 
 23
 A. "Insureds" shall mean the Entity and any Individual who was, now is, or shall be a Director, Officer, Trustee, Employee, Volunteer or Staff member of the Entity and shall include any Executive, Board Member and Committee Member whether salaried or not.
 
 
 24
 B. "Entity" shall mean only that non-profit Organization, Association or Corporation which is named in the Declarations and is legally constituted at the inception date of this policy....
 
 
 25
 ...
 
 
 26
 D. The term "Wrongful Act" shall mean any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty by one or more of the individual Insureds while acting in their capacity as an authorized representative of the Entity, subject to the further terms, conditions and limitations of this policy.
 
 
 27
 E. "Loss" shall mean any amount which the Insureds are legally obligated to pay or which the Entity shall be required, or permitted by law to pay as indemnity to the Insureds, for any claim or claims made against them, for Wrongful Acts....
 
 
 28
 On the basis of the coverage language, we cannot affirm the district court for the reason given by it. The fact that Basin could not recover from Continental is not cause in and of itself for holding that Basin cannot recover from its insurer. If Basin's officers were, in fact, negligent in filing the involuntary petition in bankruptcy and if Midwest was, in fact, insolvent in the bankruptcy sense at the time Basin filed the petition, then Basin would, absent special circumstances, be entitled to recover under the plain language of the insurance policy.
 
 
 29
 Basin would clearly be an "insured" under section III, paragraph A, and the officers, directors, and employees of Basin were "insureds" under the same provisions. If the officers and directors acted negligently in filing the bankruptcy petition by failing to join two additional creditors, that negligence would be a "wrongful act" within the meaning of section III, paragraph D. Moreover, Basin would have incurred a "loss" under section III, paragraph E because it was required to refund a payment made to it under the letter of credit issued by Continental, a payment resulting from the negligence of the officers, directors, and employees of Basin.
 
 
 30
 The difficulty here is that Basin's officers and directors did not act negligently. The district court instead held that Basin had not acted in good faith in filing the petition for the involuntary bankruptcy of Midwest for two reasons. The first, to which we have already alluded, is that the petition was not signed by three creditors. The second is that Basin was motivated by an improper reason to file the petition, that reason being its desire to draw on the letter of credit provided by Continental. This court affirmed the district court, specifically relying on both reasons. Thus, we accept these decisions as the law of the case.[5] See, e.g., Little Earth of United Tribes v. Dept. of Housing, 807 F.2d 1433, 1441 (8th Cir.1986); Liddell v. Missouri, 731 F.2d 1294, 1304-05 (8th Cir.), cert. denied, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984); see also Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (law of the case is a doctrine of discretion); Liddell, 731 F.2d at 1304-05 (the doctrine protects settled expectations of parties, ensures uniformity of decisions and promotes judicial efficiency); United States v. Unger, 700 F.2d 445, 450 n. 10 (8th Cir.), cert. denied, 464 U.S. 934, 104 S.Ct. 339, 78 L.Ed.2d 308 (1983) (we will reconsider law of the case when substantially different evidence has been introduced or decision is clearly erroneous and works manifest injustice).
 
 
 31
 Basin does not and could not allege that the filing of the involuntary petition in bankruptcy for the purpose of realizing on its letter of credit was a wrongful or negligent act by its officers, directors, or employees. Indeed, the action taken was the only prudent action the directors and officers could take if they were to protect Basin's security interest in Midwest. They had already thoroughly explored with Midwest an extension of the existing letter of credit or the writing of a new letter. These discussions were unsuccessful.[6] The fact that the district court and this court subsequently held that the filing was in bad faith because it was motivated by an improper reason does not make this prudent action, although ultimately unsuccessful, a "wrongful act" under the terms of section III, paragraph D. To hold otherwise would force the directors and officers to commit a "wrongful act" if they either did or did not file the petition for bankruptcy. In these terms, this conduct appears to be merely a difficult business decision that did not reap the corporation a contingent benefit and not a "wrongful act" as encompassed by the policy. Thus, we have no alternative but to affirm the district court.
 
 
 
 *
 The Honorable Daniel M. Friedman, United States Senior Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 The bankruptcy court found that Midwest had operated at a substantial loss since 1982; that it had suffered a net loss of 7.7 million dollars in 1983; that its assets had declined by approximately four million dollars from 1982 to the end of fiscal year 1983; that Midwest's net loss from operations in the first seven months of fiscal year 1984 had exceeded seven million dollars; that the Midwest processing facility had been closed from the spring of 1983 until October of that year and had been shut down again in mid-February of 1984; that Midwest had laid off 52 employees in the spring of 1984; that while Midwest had been paying its bills, it had only been able to do so because its principal stockholders had injected nearly one million dollars into the business; that Midwest had long-term obligations of 45 million dollars and that it had failed to make an interest payment of 2.8 million dollars due on February 28, 1984 on these obligations
 
 
 [2]
 The district court reasoned on August 22, 1988 that a genuine dispute regarding whether the officers' and directors' conduct fell within the scope of one of the policy exclusions existed. August 22 Order at 8. The court did not discuss the scope of coverage issue
 
 
 [3]
 Basin asserted additional claims for $500,000 which were unrelated to the bankruptcy claim and were agreed to in settlement discussions. The district court stated:
 The policy is clearly not intended to insure that Basin suffers no business reversals through errors in judgment made by officers and directors managing the new company.
 Under the facts of this case, no officer, director or employee was faced with any liability to any third party which was claimed to have arisen from any error or omission. No event occurred which could create personal liability of any officer, director or employee to either a third party or to Basin, the employer.
 April 18 Order at 6. We agree with this analysis and would add that there are no allegations or supporting affidavits in the record to indicate that the settlement agreement with respect to the $500,000 was anything other than a good faith settlement between the parties based on the exercise of judgment by the officers and directors.
 
 
 [4]
 Crum & Forster asserted that the officers' and directors' conduct fell into each of the following exclusions:
 The Company shall not be liable to make payment for Loss in connection with any claim made against the Insureds allegedly, based upon or arising out of one or more of the following:
 
 
 [1]
 An Insured gaining any personal profit or advantage to which they were not legally entitled;
 
 
 [2]
 The return by the Insureds of any remuneration paid in fact to them if payment of such remuneration shall be held by the courts to be in violation of law;
 
 
 [3]
 Brought about or contributed to by the dishonesty of the Insureds, however, notwithstanding the foregoing, the Insureds shall be protected under the terms of this policy as to any claim upon which suit is brought against them by reason of any alleged dishonesty on the part of the Insureds, unless a judgment or other final adjudication thereof adverse to the Insureds shall establish that acts of active and deliberate dishonesty committed by the Insureds with actual dishonest purpose and intent were material to the cause of action so adjudicated;
 . . . . .
 
 
 [7]
 The willful violation of statute or ordinance committed by or with the knowledge or consent of an insured
 
 
 [5]
 Were we writing on a clean slate, we would be inclined to hold that Basin had a right to file the petition to place Midwest in bankruptcy. Only by taking this action could it protect its secured position. To be sure, the rights of the unsecured creditors would be affected by this action because Midwest made a two million dollar deposit with Continental Bank to partially protect Continental if it were required to pay on the letter of credit. The unsecured creditors would thus have had two million dollars less to distribute among themselves
 Of course, Basin would, as the bankruptcy court held, have had an obligation to prove that Midwest was not generally paying its debts, a fact found to be true by the bankruptcy court. The district court, however, did not reach this question because it held that Basin's subjective motives in filing the petition were controlling rather than whether Midwest was generally paying its bills as they came due.
 As this court has noted, intervention as a petition in an involuntary bankruptcy proceeding is a right which the court must acknowledge. As long as the claims which the petitioners hold are not contingent as to liability and aggregate an unsecured sum of at least $5,000.00, the court will accept the petition for involuntary relief and address its merits. Although Midwest disputes the claim of Basin Electric, it does not dispute that Basin Electric asserts a claim in an amount which exceeds by more than $5,000.00 the value of its claimed security. Basin Electric has standing to be a petitioning creditor in this proceeding, notwithstanding that it is the holder of a disputed claim. See In re R.N. Salem Corp., 23 B.R. 452, 456 (Bankr.S.D.Ohio 1982) ("One need thus look no further than the statute itself for a determination that 'claim' for purposes of the Bankruptcy Code includes disputed claims and unmatured claims, ..."). As the court has previously indicated, the intervening creditors also have standing as petitioners in this proceeding. Since there are three qualified petitioners which support the involuntary petition in this proceeding, the court will address the merits of that petition.
 . . . . .
 [S]ufficient evidence remains before the court to dictate that it find that Midwest is not generally paying its debts as they come due.
 The most significant indication that Midwest is unable to meet its obligations on a current basis is its failure to pay interest on its long-term obligations. An interest payment of $2,786,062.61 was due February 28, 1984. Midwest failed to make that payment. Another interest payment of $2,786,062.61 is due August 31, 1984. Since Midwest is not operating its crushing plant, the court cannot envision that the August 31, 1984 payment of interest will be met. Although Midwest has to this date only missed one interest payment, the missed payment is not of an insubstantial sum and there appears little hope that Midwest will be able to meet these interest payments in the future.
 In addition to Midwest's failure to make interest payments on its long-term obligations, Midwest currently has pre-petition obligations to its shareholders in an approximate amount of $696,459.53.... Although Midwest has been able to keep current on a large number of its monthly obligations, it has been only able to do so because of a deferral of payments on its obligations to its shareholders, in addition to the large infusions of cash received from its shareholders.
 In re: Midwest Processing Co., 41 B.R. 90, 99-100, 101 (Bankr.D.N.D.1984).
 
 
 [6]
 Apparently none of the other creditors would have benefited from a filing of Basin's petition of bankruptcy. It appears that no other creditors, secured or unsecured, had an agreement similar to Basin's letter of credit